[SLAVE TRADE ACTS.  INSTANCE COURT.]

# The JOSEFA SEGUNDA.  ROBERTS and others, Claimants.

The District Courts have jurisdiction, under the Slave Trade Acts, to determine who are the actual captors, under a State law made in pursuance of the 4th section of the Slave Trade Act of 1807, c. 77. and directing the proceeds of the sale of the negroes to be paid, " one moiety for the use of the commanding officer of the capturing vessel," &c.

In order to constitute a valid seizure, so as to entitle the party to the proceeds of a forfeiture, there must be an open, visible possession claimed, and authority exercised, under the seizure.

A seizure, once voluntarily abandoned, loses its validity.

A seizure, not followed by an actual prosecution, or by a claim, in the District Court, before a hearing on the merits, insisting on the benefit of the seizure, becomes a nullity.

Under the 7th section of the Slave Trade Act of 1807, c. 77. the entire proceeds of the vessel are forfeited to the use of the United States, unless the seizure be made by armed vessels of the navy, or by revenue cutters, in which case distribution is to be made in the same manner as prizes taken from the enemy.

Under the act of the State of Louisiana of the 13th of March, 1818, passed to carry into effect the 4th section of the Slave Trade Act of Congress of 1807, c. 77. and directing the negroes imported contrary to the act to be sold, and the proceeds to be paid, " one moiety for the use of the commanding officer of the capturing vessel, and the other moiety to the Treasurer of the Charity Hospital of New-Orleans, for the use and benefit of the said hospital ;" no other person is entitled to the first moiety than the commanding officer of the armed vessels of the navy, or revenue cutter, who may have made the seizure, under the 7th section of the act of Congress.

APPEAL from the Circuit Court of Louisiana.

This is the same case which was reported *ante*, vol. 5. p. 338. It was a proceeding against the vessel, and the negroes taken on board of her, under the Slave Trade Act of the 3d of March, 1807, c. 77. in which the vessel was condemned in the Court below, and that decree was affirmed on appeal, by this Court. After the condemnation of the vessel in the District Court, and before the appeal to this Court, the negroes found on board of her were, (under the 4th section of the act of Congress, and under an act of the State of Louisiana, passed on the 13th of March, 1818, in pursuance of the act of Congress,) delivered by the Collector of the Customs for the port of New-Orleans, to the Sheriff of the parish of New-Orleans, for sale according to law. A cross libel was afterwards filed by the alleged original Spanish owners, claiming restitution of the negroes, which was dismissed, and, on appeal, the decree affirmed by this Court. By consent of all the parties in interest, the negroes were sold by the Sheriff, and the proceeds lodged in the Bank of the United States, subject to the order of the Court below. After the cause had been remanded to the District Court, a question arose in that Court respecting the manner in which these proceeds, as well as those of the vessel and effects, were to be distributed, and the parties respectively entitled to them. Mr. Roberts, an inspector of the revenue, claimed a moiety of the proceeds as the original seizor or captor; Messrs. Gardner, Meade, and Humphrey, respectively, made similar claims under subse-

quent military seizures alleged to be made by them ; and Mr. Chew, the Collector of the port of New-Orleans, conjointly with the Naval Offi-cer and Surveyor of the port, filed a like claim as the true and actual captors and seizors, who made the last and only effectual seizure, and pro-secuted the same to a final sentence of condemna-tion.[a]

*a* The act of Congress of the 3d of March, 1807, c. 77. (s. 4.) after providing a personal penalty for taking on board, receiving, or transporting any negro, &c. from Africa, or any other foreign country, for the purpose of selling them as slaves, in any part of the United States, enacts, that " every such ship or vessel, in which such negro, mulatto, or person of colour, shall have been taken on board, received, or transported as aforesaid, her tackle, apparel, and furniture, and the goods and effects which shall be found on board the same, shall be forfeited to the United States, and shall be liable to be seized, prosecuted and condemned, in any of the Cir-cuit Courts or District Courts, in the District where the said ship or vessel may be found or seized. And neither the importer, nor any person claiming from or under him, shall hold any right or title whatsoever to any negro, mulatto, or person of colour, nor to the service or labour thereof, who may be imported or brought within the United States, or territories thereof, in violation of this law, but the same shall remain subject to any regulations not con-travening the provisions of this act, which the Legislatures of the several States or territories at any time hereafter may make, for disposing of any such negro, mulatto, or person of colour." (s. 7.) " That if any ship or vessel shall be found, from and after the first day of January, 1808, in any river, port, bay, or harbour, or on the high seas, within the jurisdictional limits of the United States, or hovering on the coasts thereof, having on board any negro, mulatto, or person of colour, for the purpose of selling them as slaves, or with intent to land the same in any port or place within the jurisdiction of the United States, contrary to the prohi-bition of this act, every such ship or vessel, together with her tackle, apparel, and furniture, and the goods or effects which shall be

It appeared, by the evidence, that Roberts, being employed as an inspector in a revenue boat at the Balize, near the mouth of the Mississippi,

found on board the same, shall be forfeited to the use of the United States, and may be seized, prosecuted and condemned in any court of the United States having jurisdiction thereof. And it shall be lawful for the President of the United States, and he is hereby authorized, should he deem it expedient, to cause any of the armed vessels of the United States to be manned and employed to cruize on any part of the coast of the United States, or territories thereof, where he may judge attempts will be made to violate the provisions of this act, and to instruct and direct the commanders of armed vessels of the United States, to seize, take, and bring into any port of the United States, such ships or vessels, and moreover to seize, take, and bring into any port of the United States, all ships or vessels of the United States, wheresoever found on the high seas, contravening the provisions of this act, to be proceeded against according to law," &c. " And the proceeds of all ships and vessels, their tackle, apparel, and furniture, and the goods and effects on board of them, which shall be so seized, prosecuted, and condemned, shall be divided equally between the United States and the officers and men who shall make such seizure, take, or bring the same into port for condemnation, whether such seizure be made by an armed vessel of the United States, or revenue cutters thereof; and the same shall be distributed in like manner as is provided by law for the distribution of prizes taken from an enemy : *Provided*, That the officers and men, to be entitled to one half of the proceeds aforesaid, shall safe keep every negro, mulatto, or person of colour, found on board of any ship or vessel so by them seized, taken, or brought into Court for condemnation, and shall deliver every such negro, mulatto, or person of colour, to such person or persons as shall be appointed by the respective States, to receive the same ; and if no such person or persons shall be appointed by the respective States, they shall deliver every such negro, mulatto, or person of colour, to the overseers of the poor of the port or place where such ship or vessel may be brought or found, and shall immediately transmit to the Governor, or chief magistrate of the State, an account of their proceedings, together with the number of such ne-

on the 18th of April, 1818, boarded the vessel, and declared that he had seized her. He, soon afterwards, went on shore, and put a person on board to take charge of the vessel, which remained at anchor opposite the block-house, until the 21st of April, when Lieutenant Meade, with six soldiers in a boat, went from Fort St. Philip, in company with a custom-house boat, and Mr. Gardner, an officer of the customs, on board, took possession of the vessel, and brought her up under the guns of the fort. It appeared, that Roberts, afterwards, came on board the vessel, but did not remain on board until her arrival at the city of New-Orleans, he having left her in order to board another vessel in the river. On the 21st of April, Mr. Chew, the Collector at New-Orleans, acting on independent information which he had received, sent an armed revenue boat, with an Inspector of the Customs, down the river, with instructions to seize the vessel. On arriving at

*The Josefa Segunda.*

*1825.*

groes, mulattoes, or persons of colour, and a descriptive list of the same, that he may give directions respecting such negroes, mulattoes, or persons of colour." The act of the Legislature of the State of Louisiana, passed on the 13th of March, 1818, after reciting the substance of the above 4th section of the act of Congress, proceeds to declare, that the Sheriff of the parish of New-Orleans is authorized and required to receive any negro, &c. delivered to him in virtue of the act of Congress, until the proper Court pronounces a decree of condemnation; and after such condemnation, it authorizes him to sell such negro, &c. as a slave for life; and then declares, "that the proceeds of such sale shall, after deducting all charges, be paid over by the said Sheriff, one moiety for the use of the commanding officer of the capturing vessel, and the other moiety to the treasurer of the Charity Hospital of New-Orleans, for the use and benefit of the said hospital."

Fort St. Philip, they found the vessel at anchor op-    1825.
posite the fort, with a serjeant's guard on board,    The Josefa
which had been placed there by Major Humphrey,    Segunda.
the commanding officer at the fort.    The inspec-
tor received from that officer the ship's papers,
and took possession of the vessel and negroes,
the guard having been withdrawn, and brought
them up to the city of New-Orleans.    Proceed-
ings were commenced against the property at the
instance of Mr. Chew, and the other officers of
the customs, and though his name was not in-
serted in the libel, the prosecution was conducted
by him until its final determination, and the other
parties claiming as captors, or seizors, did not
intervene until after the decree of this Court on
the appeal in the original cause.

The Court below pronounced a decree, dismiss-
ing the claims of Messrs. Roberts, Humphrey,
Meade, and Gardner, and allowing that of the
Collector and other officers of the customs, and
the cause was brought by appeal to this Court.

Mr. *Livingston*, for the appellant, Roberts, in-    *March 15th.*
sisted, that he was entitled as the first seizor,
under the act of Congress of the 3d of March,
1807, c. 77. s. 7. and the act of the Legislature
of Louisiana, passed on the 13th of March, 1818,
in pursuance of the act of Congress, to a moiety
of the proceeds of the vessel and negroes found
on board.    He exercised all the authority and
control over the vessel he was capable of, with
the force at his disposition.    The persons on
board submitted to the seizure ; and, as in cap-

1825.
The Josefa
Segunda.

tures *jure belli*, it is not necessary that there should be a physical superiority of force on the part of the captors." He was afterwards compelled to abandon the possession; and such an abandonment, from the force and fear of another party, cannot invalidate the original seizure.[b] By the act of Congress, (s. 7.) the proceeds of the vessel and effects are to be divided equally between the United States and the officers, and men *who shall make the seizure* and by the act of Louisiana, the proceeds of the negroes are to be divided equally between *the commanding officer of the capturing vessel*, and the charity hospital. The appellant, Roberts, is entitled in both capacities; and the revenue officers, who came in after the capture was complete, and dispossessed him who was the first seizor, can have no claim under either act.

Mr. *Key*, for the appellants, Gardner, Meade, and Humphrey, argued upon the facts, to show that they were the real, meritorious captors.

The *Attorney General*, for the respondents, insisted, that if any of the parties before the Court were entitled, the Collector and other officers of the customs were the only parties entitled by law to be considered as the captors or seizors, they having made the first effectual seizure, and prosecuted it to condemnation; whilst the other claimants avoided all the expense and

a The Alexander, 8 *Cranch's Rep.* 179.
b The Mary, 2 *Wheat. Rep.* 123.

hazard of the prosecution, and did not intervene

until its successful termination. The law does not mean to encourage that kind of seizure, where the captor lays his hand on the subject, and takes it off again. That person is the seizor who informs and prosecutes. If any other person claims a title, he is bound to intervene before the first adjudication, and submit his claim to the decision of the Court.[a] It may be doubted, whether, under the 7th section of the act of Congress, any person can be entitled, as a seizor, except the officers, &c. of the armed vessels, and revenue cutters of the United States. If it be a *casus omissus,* none of the captors now before the Court are literally within the terms of the act, and the whole of the forfeiture must be to the United States. But, if any are entitled, the Collector is clearly to be preferred.

Mr. Justice STORY delivered the opinion of the Court. *March 18th.*

The case of the Josefa Segunda, in which the present controversy had its origin, is reported in the fifth volume of Mr. Wheaton's Reports. It is only necessary to mention, that after the condemnation of the vessel, in the District Court of Louisiana, and before the intervention of the appeal to this Court, the negroes seized on board of her, in pursuance of the act of Congress, and the act of Louisiana, which will be hereafter commented on, were delivered by Mr. Chew, (the

a *Hargr. Law Tracts,* 226, 227.

1825.  Collector of the Customs,) to the Sheriff of the
parish of New-Orleans, to be sold according to
law; and a few days afterwards a new libel,
claiming the property of the negroes, having been
filed by the Spanish owners, (which was after-
wards dismissed, and on appeal, the dismissal
confirmed by this Court,) by consent of all the
parties in interest, the negroes were sold by the
Sheriff, and the proceeds lodged in the Bank of
the United States, subject to the order of the
District Court. The question now in contesta-
tion respects the manner in which the proceeds
of this sale, as well as of the sale of the vessel
and effects, are to be distributed, and the parties
who are entitled to them. Mr. Roberts, who is
an Inspector of the Customs, claims title as the
original seizor or captor; Messrs. Gardner,
Meade, and Humphrey, make a like claim under
a subsequent military seizure made by them; and
Mr. Chew, and the Surveyor and Naval Officer
of the port of New-Orleans, a like claim as the
true and actual captors and seizors, who made
the last and only effectual seizure, and prose-
cuted the same to a final decree of condemna-
tion.

Mr. Chew caused the original libel against the
vessel to be brought, and though his name is ac-
cidentally omitted in it as the officer through
whose instrumentality the seizure was made, yet
it is admitted, and indeed could not be denied, that
he was the sole responsible prosecutor of the
suit, until the final condemnation of the vessel,
and the final dismissal of the second libel,

brought by the original Spanish claimants. The
claims of all the other parties now before the
Court, adverse to that of Mr. Chew, have inter-
vened since the final judgment pronounced in
the Supreme Court in the cause.

The Josefa Segunda was finally condemned
under the seventh section of the Slave Trade
Act, of the 2d of March, 1807, ch. 77. It will be
necessary to refer to the terms of that section at
large, because the question here respects as well
the distribution of the proceeds of the vessel,
(which must be made according to the rules pre-
scribed in that section,) as of the proceeds of the
sale of the negroes, who were unlawfully brought
into the United States ; and, in the progress of
the discussion, it will materially aid us in the de-
cision of the latter, to ascertain who, by the con-
struction of that section, are the captors entitled
to the distribution of the former.

The fourth section of the act of 1807 provides,
that " neither the importer, nor any person or
persons claiming from or under him, shall hold
any right or title whatsoever to any negro, &c.
who may be imported or brought within the
United States, or territories thereof, in violation
of this law ; but the same shall remain, subject to
any regulations, not contravening the provisions
of this act, which the Legislatures of the several
States or territories, at any time hereafter may
make, for disposing of any such negro," &c.
Accordingly, the Legislature of Louisiana, on the
13th of March, 1818, passed an act avowedly to
meet the exigency of this section, which act, af-

ter reciting the substance of the same section, proceeds to declare, that the Sheriff of the parish of New-Orleans is authorized and required to receive any negro, &c. delivered to him in virtue of the act of Congress, until the proper Court pronounces a decree of condemnation; and after such condemnation, it authorizes him to sell such negro, &c. as a slave for life; and then declares, that " the proceeds of such sale shall, after deducting all charges, be paid over by the said Sheriff, one moiety *for the use of the commanding officer of the capturing vessel,* and the other moiety to the treasurer of the Charity Hospital of New-Orleans, for the use and benefit of the said hospital." There is no doubt that this act is not in contravention of the intention of the act of Congress, for the sixth section contains a proviso, recognising the validity of such a sale, when made under the authority of a State law.

Some objection has been suggested as to the jurisdiction of the District Court of Louisiana, to entertain the present proceedings, upon the ground that the distribution is to be made under this act by the Sheriff of New-Orleans. But upon a full consideration of the act of 1807, we are of opinion, that the objection cannot be maintained. By the judiciary act of 1789, as well as by the express provisions of the act of 1807, the District Court has jurisdiction over seizures made under the latter act. The principal proceedings are certainly to be against the vessel, and the goods and effects found on board. But

the negroes are also to be taken possession of, for the purpose of being delivered over to the State governments, according to the provision of the act; and it is obvious, that this delivery can only be after a condemnation has occurred, since it is only in that event that the State Legislature can acquire any right to dispose of them. The proviso in the seventh section, that the officers to whom a moiety of the proceeds is given on condemnation, shall be so entitled only in case they safely keep and deliver over the negroes according to the laws of the States, operates by way of condition to the completion of their title; but does not import any requirement that the delivery shall be until after the condemnation. On the contrary, as by a decree of restitution of the vessel and effects, the claimants would be entitled to a restitution of the negroes, the reasonable construction seems to be, that they remain subject to the order of the District Court, as property in the custody of the law, though in the actual possession of the seizing officers. The possession of the latter is the possession of the Court, as much in respect to the negroes as the vessel and cargo; and it must remain until the Court, by pronouncing a final decree, directs in what manner it is to be surrendered. In the present case, the negroes were sold, and the proceeds substituted for them were in the custody of the Court. It was, therefore, authorized to deliver them over to the parties who should be entitled, under the State law. In terms, the State law required the delivery to the

Sheriff to the use of the parties; but who the parties were to whose use the Sheriff must hold them, could not be ascertained by him, but must be awarded by the Court, to whom, as an incident to the principal cause, it exclusively belonged. In what manner could any other Court be authorized to ascertain who was *the commanding officer of the capturing vessel?* The decree of the Court, in distributing the proceeds of the vessel and cargo, must necessarily involve this inquiry; and certainly it cannot for a moment be maintained in argument, that any other person than the commander of the capturing vessel, who would share the proceeds of the prize and her cargo, could be within the meaning of the law of Louisiana. The common form of drawing up decrees, in cases of condemnation, is, that the proceeds be distributed according to law. But if any difficulty arises, upon petition, the Court always proceeds to decide who are the parties entitled to distribution, and to make a supplementary decree. But it may do the same in the first instance, and make the particulars of the distribution a part of the original decree. In the present case, if the original decree had been drawn out at large, it ought to have been, that the negroes so captured be delivered over to the Sheriff of New-Orleans for sale, according to the act of Louisiana in this behalf provided, and that the net proceeds of the sale be afterwards paid over, viz. one moiety to A. B., adjudged by the Court to be the commanding officer of the capturing vessel, and the other moiety to the Charity Hospital

of New-Orleans. This course of proceeding is very familiar in prize causes; where the Court of Admiralty always ascertains who are the captors entitled to the prize proceeds; and the Courts of common law will never entertain any jurisdiction over the proceeds until after such adjudication. Considering this cause, then, as a cause of admiralty and maritime jurisdiction, belonging exclusively to the Courts of the United States, we are not aware how any other Court could adjudge upon the question who were the captors or seizors entitled to share the proceeds; and we think that the District Court has jurisdiction over the present proceedings.

In respect to the claim of Mr. Roberts, we do not think that the evidence establishes that he ever made any valid seizure of the vessel. It is not sufficient that he intended to make one, or that, on some occasions, he expressed to third persons that he had so done. There must be an open, visible possession claimed, and authority exercised under a seizure. The parties must understand that they are dispossessed, and that they are no longer at liberty to exercise any dominion on board of the ship. It is true, that a superior physical force is not necessary to be employed, if there is a voluntary acquiescence in the seizure and dispossession. If the party, upon notice, agrees to submit, and actually submits, to the command and control of the seizing officer, that is sufficient; for, in such cases, as in cases of captures *jure belli*, a voluntary surrender of authority, and an agreement to obey the captor.

*1825.*

*The Josefa Segunda.*

*What is necessary to constitute a valid seizure, so as to entitle the party to the proceeds of a forfeiture.*

1825.

The Josefa
Segunda.

supplies the place of actual force. But, here, Mr. Roberts gave no notice of the seizure to the persons on board; he exercised no authority, and claimed no possession. He had no force adequate to compel submission; and his appearance in the vessel gave no other character to him than that of an inspector, rightfully on board, in performance of his ordinary duties. To construe such an equivocal act as a seizure, would be unsettling principles.

Messrs. Humphrey, Meade, and Gardner, certainly did make a seizure, by their open possession of the vessel, and bringing her under the guns of Fort St. Philip. But there is this objection to the seizure, both of Mr. Roberts, (assuming that he made one,) and of the other persons, that it was never followed up by any subsequent prosecution

Effect of a voluntary abandonment of a seizure.

or proceedings. The seizure of Messrs. Humphrey, Meade, and Gardner, seems to have been voluntarily abandoned by them; and even that of Mr. Roberts, if he made one, does not seem to have been persisted in. Now, a seizure, or capture, call it which we may, if once abandoned, without the influence of superior force, loses all its validity, and becomes a complete nullity. Like the common case of a capture at sea, and a voluntary abandonment, it leaves the property open to the next occupant. But what is decisive in our view is, that neither of these gentlemen ever attempted any prosecution, or intervened in the original proceedings in the District Court, claiming to be seizors, which was indispensable to consummate their legal right; and their claim

was, for the first time, made after a final decree of condemnation in the Supreme Court. This was certainly a direct waiver of any right acquired by their original seizures. It is not permitted to parties to lie by, and allow other persons to incur all the hazards and responsibility of being held to damages in case the seizure turns out to be wrongful, and then to come in, after the peril is over, and claim the whole reward. Such a proceeding would be utterly unjust, and inadmissible. If the parties meant to have insisted on any right, as seizors, their duty was to have intervened in the District Court before the hearing on the merits, according to the course pointed out by Lord Hale in the passage cited at the bar, where there are several persons claiming to be seizors of forfeited property.[a] In the present case, Mr. Chew actually advanced a considerable sum of money for the maintenance of these negroes during the pendency of the suit ; and if it had been unsuccessful he must have exclusively borne the loss. Upon the plain ground, then, that Mr. Roberts, and Messrs. Humphrey, Meade, and Gardner, have not followed up their seizure by any prosecution, such as the act of 1807 re-

a *Harg. Law Tracts*, (4to.) p. 227. " At common law, any person might seize uncustomed goods to the use of the king and himself, and thereupon inform for a seizure. But yet, if A. seize goods uncustomed, and then B. seize them for the same cause, he that first seizeth ought to be preferred as the informer. And, therefore, if B., that seized after, first inform, and A. also inform, A. may be admitted to interplead with B., upon the priority of the seizure, before the merchant shall be put to answer either."

quires, we are of opinion, that there is no foundation, in point of law, for their claims.

That Mr. Chew, on behalf of himself, and the Surveyor and Naval Officer of the port of New-Orleans, did make the seizure on which the prosecution in this case was founded, is completely proved by the evidence ; it is also admitted by the United States, in their answer to the libel of Messrs. Carricaberra, &c. the Spanish claimants, and is averred by Mr. Chew, and his coadjutors, in their separate allegation and answer to the same libel. While the vessel lay at Fort St. Philip, armed boats, under revenue officers, were sent down by him, with orders to seize her, and bring her up to New-Orleans for prosecution, which was done accordingly.

The remaining question then is, whether Mr. Chew, for himself and his coadjutors in office, is to be considered as entitled to the proceeds of the vessel under the act of Congress, and to the proceeds of the negroes, as " the commanding officer of the capturing vessel," within the sense of the Louisiana law.

If he is entitled to the proceeds of the vessel and cargo, under the 7th section of the act of 1807, then, we think, he must be fairly considered as within the spirit, if not the letter, of the act of Louisiana.

The 7th section is certainly not without difficulty in its construction. In the first clause it declares, that vessels found " in any river, port, bay, or harbour, or on the high seas, within the jurisdictional limits of the United States, or

hovering on the coast thereof, having on board any negro, &c. for the purpose of selling them as slaves, &c; contrary to the prohibitions of this act, shall be forfeited to the use of the United States, and may be seized, prosecuted, and condemned, in any Court of the United States having jurisdiction thereof." Under this clause, standing alone, it cannot be doubted, that any person might lawfully seize such a vessel at his peril, and if the United States should choose to adopt his act, and proceed to adjudication, he would, in the event of a condemnation, be completely justified. But it may be considered as peculiarly the duty of the officers of the customs, to watch over any maritime infractions of the laws of the United States; and, by the Collection Act of 1799, (ch. 128. s. 70.) it is made the duty of all custom-house officers, as well within their Districts as without, to make seizures of all vessels violating the revenue laws.

The section, then, in the next clause, authorizes the President of the United States to employ any of the armed vessels of the United States to cruise on any part of the coast, to prevent violations of the act, and to instruct and direct the commanders of such armed vessels, to seize all vessels contravening the act, " wheresoever found on the *high seas*," omitting the words, " in any river, port, bay, or harbour," contained in the former clause. It then proceeds to declare, that the proceeds of all such vessels, when condemned, " shall be divided equally between the United States, and the officers and men, who shall make

1825. such seizure, take or bring the same into port for condemnation, whether such service be made by an armed vessel of the United States, *or revenue cutters thereof*, and the same shall be distributed in like manner as is provided by law for the distribution of prizes taken from an enemy." In a strict sense, the present seizure was not made by an armed vessel of the United States, nor by a revenue cutter, which, by the act of 1799, (ch. 128. s. 98.) the President is at liberty to require to co-operate with the navy. But if we consider these cases as put only by way of example, or if we give an enlarged meaning to the words "revenue cutter," so as to include revenue boats, such as the Collector is, by the act of 1799, (ch. 128. s. 101.) authorized to employ, with the approbation of the Treasury department, then the seizure of Mr. Chew may be brought within the general terms of the act. The United States do not appear to have resisted this construction as to the proceeds of the sale of the Josefa Segunda. And, on the other hand, if we consider, that the act meant to deal out the same rights to all parties who might seize the offending vessel, whether they were officers of armed vessels, or of revenue cutters, or merely private individuals, who may seize and prosecute to condemnation, then, under that construction, Mr. Chew may be properly deemed the seizing officer, entitled, with his crew, to the proceeds of the vessel. If such a construction is not admissible, within the equity of the act, then it is a *casus omis-*

*sus*, and the property yet remains undisposed of by law.

Upon the best consideration which we have been able to give the case, we are of opinion, that it is a *casus omissus*, or rather, that all the beneficial interest vests in the United States. The first clause of the seventh section declares, that all vessels offending against it, " shall be forfeited to *the use of the United States*," and may be seized, prosecuted, and condemned, accordingly. The seizure may be made by any person; but the forfeiture is still to be, by the terms of the act, for *the use of the United States*. If the act had stopped here, no difficulty in its construction could have occurred. As nothing is given by it to the seizing officer, nothing could be claimed by him except from the bounty of the government. The subsequent clause looks exclusively to cases where the seizure is made by armed vessels of the navy, or by revenue cutters, and directs, in such an event, a distribution to be made in the same manner as in cases of prizes taken from an enemy. Correctly speaking, these cases constitute exceptions from the preceding clause, and take them out of the general forfeiture " *to the use of the United States.*" It might have been a wise policy to have extended the benefit of these provisions much farther, or to have given, as the act of the 20th of April, 1818, (ch. 35.) has given, a moiety in all cases to the person who should prosecute the seizure to effect. But Courts of law can deal with questions of this nature only so far as the Legislature has clearly

expressed its will.   Mr. Chew appears to be a very meritorious officer, and deserving of public respect for his good conduct on this occasion. But as the act has made no provision for his compensation, he must be left, in common with those who made the military seizure, to the liberality of the government.

The remarks which have been already made, dispose of the case, so far as respects the proceeds of the vessel, and we think they are decisive as to the claim to the proceeds of sale of the negroes.   The case as to this matter is also a *casus omissus* in the act of Louisiana.   That act had a direct reference to the act of Congress, and " the commanding officer of the capturing vessel," in the sense of the former, must mean the commanding officer of such an armed vessel, or revenue cutter, as is entitled to share in the distribution of the proceeds by the latter.   It would be going very far to give a larger construction to the words than in their strict form they import; and since they admit of a reasonable interpretation, by confining them to the cases provided for by Congress, we are satisfied that our duty is complied with, by assigning to them this unembarrassed limitation.

The decree of the District Court, so far as it dismisses the claims of Messrs. Roberts, Humphrey, Mead, and Gardner, is affirmed, and so far as it sustains the claim of Mr. Chew, and the Naval Officer and Surveyor of the port of New-Orleans, is reversed.

Decree accordingly.