June 26, 2024

**Supreme Court**

No. 2021-34-C.A.
(P2/18-488AG)

(Dissent begins on Page 25)

|  |  |
|---|---|
| State | : |
| v. | : |
| Napoleao Pires. | : |

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

| | |
|---|---|
| State | : |
| v. | : |
| Napoleao Pires. | : |

Present: Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

## O P I N I O N

**Chief Justice Suttell, for the Court.** The defendant, Napoleao Pires, appeals from a judgment of conviction for carrying a firearm without a license and possession of a controlled substance. The defendant challenges the trial justice's decision to deny his motion to suppress on the basis that the seizure violated his constitutional rights under the Fourth Amendment to the United States Constitution and article 1, section 6, of the Rhode Island Constitution. For the reasons set forth in this opinion, we reverse the decision on the motion to suppress and, accordingly, vacate the judgment of conviction entered in the Superior Court.

# I

## Facts and Travel[1]

On July 9, 2016, at approximately 1:00 a.m., Patrol Officer James Leach of the Pawtucket Police Department arrived at the intersection of Dunnell Avenue and Sisson Street in response to a dispatch. The dispatch reported that a light-skinned black male, wearing a striped shirt and dark pants, was walking around with a gun in his hand.[2] When Officer Leach arrived, he observed a man who matched the description—defendant—walking just north of the intersection. Officer Leach did not observe anyone else in the area. The intersection was well-lit, illuminated by streetlights and the headlights of Officer Leach's police cruiser. Officer Leach did not detect any criminal activity afoot, and he could not see defendant's hands to

---

[1] We derive the facts of the case from the evidence produced by the state and the testimony adduced at the hearing on the motion to suppress. At the hearing, the trial justice heard testimony from Officer James Leach (the officer who conducted the stop), Officer Matthew Levasseur (the backup officer who discovered the firearm), and defendant. After hearing the testimony from all witnesses, the trial justice credited Officer Leach's testimony as the facts of the case.

"When reviewing a trial justice's decision granting or denying a motion to suppress, we defer to the factual findings of the trial justice, applying a clearly erroneous standard." *State v. Cosme*, 57 A.3d 295, 299 (R.I. 2012) (quoting *State v. Storey*, 8 A.3d 454, 459-60 (R.I. 2010)). Because the trial justice found Officer Leach's testimony to be credible and correspondingly discredited defendant's testimony, we adopt Officer Leach's version of the events as the facts for purposes of this appeal, owing deference to the trial justice's factual determinations.

[2] At the suppression hearing, Officer Leach alternately described the dispatch as a call for "a man waving a gun" and "a man with a gun." The trial justice adopted the latter characterization and referred to the dispatch as speaking of "a light-skinned black male * * * walking * * * with a gun at one o'clock in the morning."

determine whether defendant was holding a gun. Nevertheless, Officer Leach ascertained that defendant was the man described in the dispatch, based on his clothing, appearance, and location.

Observing that defendant matched the description, Officer Leach exited his cruiser, wearing his full police uniform, and immediately commanded defendant to show Officer Leach his hands. The defendant complied.

Officer Leach next ordered defendant to turn around, face away, and walk backward toward the sound of Officer Leach's voice while keeping his hands up. Instead, defendant walked forward toward Officer Leach, although his hands were still raised. Officer Leach repeated the order for defendant to turn around and walk backward, but defendant proceeded forward. At this point, Officer Leach was unsure whether defendant was noncompliant or simply unable to understand his instructions.

Once defendant came within a twelve- to fifteen-foot radius of Officer Leach, defendant pivoted and reached for his waistband. Officer Leach thought that defendant was attempting to grasp a firearm. In a "split-second decision[,]" Officer Leach grabbed defendant from behind and incapacitated him by the use of a "full

nelson."[3]  The defendant began speaking in a foreign language but did not otherwise struggle or resist.[4]

Two additional Pawtucket police officers then reported to the scene for backup.  Officer Leach instructed one of them to look in defendant's waistband.  The backup officer looked in defendant's waistband and immediately yelled, "gun."  Officer Leach secured defendant on the ground and placed him in handcuffs.  The officers searched defendant's person.   In addition to the firearm, the officers uncovered "crack cocaine and also a white powdery substance that appeared to be cocaine as well wrapped up in a dollar bill loose."  The officers confirmed that the firearm was not loaded and, after canvassing the surrounding area, affirmed that no ammunition had been abandoned nearby.  The officers then placed defendant under arrest.

---

[3] On direct examination, Officer Leach described a "full nelson" as a tactic used to physically incapacitate defendant by apprehending him under the armpits and grasping around his neck to lift him off the ground, which restricted any further movement.

[4] The defendant testified that his first language is Cape Verdean Creole.  He acknowledged that he understands some English and that he attended one year of high school in the United States, but he did not graduate.  He participated in the hearing and trial process with the assistance of an interpreter.

At some point after defendant's arrest, Officer Leach spoke with "the reporting party." He testified, "I went to her house, and she did not want to complete a written statement."[5]

Thereafter, the state charged defendant with possession of a stolen firearm, in violation of G.L. 1956 § 11-47-5.2; carrying a pistol or revolver without a license or permit, in violation of § 11-47-8(a); and possession of cocaine, in violation of G.L. 1956 § 21-28-4.01(c)(2)(i). The defendant moved to suppress the white powdery substance and the firearm as fruits of an unconstitutional search and seizure.

On July 15, 2019, a justice of the Superior Court held a hearing on the motion to suppress. At the hearing, the trial justice elicited testimony about the nature of the neighborhood and determined that, under the totality of the circumstances—Officer Leach's thirty years of experience as a law enforcement officer, the dispatch sending him to "one of the higher crime" areas in Pawtucket, defendant's match to the dispatch description "to a T," defendant's deliberate noncompliance to Officer

---

[5] On cross-examination, "the reporting party" was identified as "Artie." Defense counsel inquired:

> "[DEFENSE COUNSEL]: And you, yourself, had never worked with Artie before, this person, or had been in her presence in any way, correct?
>
> "[OFFICER LEACH]: Correct."

No further evidence concerning the identity of "Artie" or her report to the police is in the record of the suppression hearing.

Leach's commands, and defendant's pivot to reach for his waistband—amounted to the level of reasonable suspicion required to justify the warrantless stop. As a result, the trial justice concluded that the gun and cocaine had been lawfully seized, and he thus denied defendant's motion to suppress.

On March 4, 2020, the Superior Court held a bench trial on the charges brought against defendant. The trial justice found defendant guilty of carrying a pistol or revolver without a license or permit and possession of cocaine.[6] The defendant was sentenced to two separate sentences, to be served concurrently, with one year to serve and four suspended, with five years of probation, for the firearm charge; and one year suspended, with one year of probation, for the controlled-substance charge.[7] A judgment of conviction and commitment then entered on September 16, 2020.

On July 2, 2020, defendant filed a premature but valid notice of appeal.

---

[6] The state dismissed the charge for possession of a stolen firearm, in violation of G.L. 1956 § 11-47-2, pursuant to Rule 48(a) of the Superior Court Rules of Criminal Procedure.

[7] At the time of this sentence, defendant was already serving a three-year sentence at the Adult Correctional Institutions for three counts of simple assault and battery, to which he had pled nolo contendere. The sentence imposed for the charges connected with this appeal were set to be served concurrently with defendant's ongoing sentence at the ACI.

## II

## Standard of Review

This Court reviews *de novo* an alleged violation of a constitutional right. *See State v. Keohane*, 814 A.2d 327, 329 (R.I. 2003). When conducting this review, we defer to the factual findings of the trial justice, applying a clear error standard, and we address questions of law *de novo*. *See State v. Patino*, 93 A.3d 40, 50 (R.I. 2014); *see also Ornelas v. United States*, 517 U.S. 690, 699 (1996) ("We therefore hold that as a general matter determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal.").

## III

## Discussion

The Fourth Amendment to the United States Constitution and its Rhode Island counterpart, article 1, section 6 of the Rhode Island Constitution, protect persons against unreasonable searches and seizures. *Patino*, 93 A.3d at 51 (stating that the purpose of these constitutional provisos is to "guarantee the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the Government" (brackets omitted) (quoting *Skinner v. Railway Labor Executives' Association*, 489 U.S. 602, 613-14 (1989))); *see also State v. Hudgen*, 272 A.3d 1069, 1079 (R.I. 2022) (recognizing that the Fourth Amendment and its Rhode Island counterpart provide the same protections). "The question of whether a search

and seizure is unreasonable under the Fourth Amendment is based on the totality of the facts and circumstances of each case." *Patino*, 93 A.3d at 51 (citing *Cooper v. California*, 386 U.S. 58, 59 (1967)).

It is well settled that "a police officer may conduct an investigatory stop, provided the officer has a reasonable suspicion based on specific and articulable facts that the person detained is engaged in criminal activity." *State v. Abdullah*, 730 A.2d 1074, 1076 (R.I. 1999) (brackets omitted) (quoting *State v. Halstead*, 414 A.2d 1138, 1147 (R.I. 1980)). We determine whether an officer's suspicions are sufficiently reasonable to justify a search based on the totality of the circumstances. *See Keohane*, 814 A.2d at 330 (citing *United States v. Cortez*, 449 U.S. 411, 417 (1981)).

The defendant claims that the trial justice erred in denying his motion to suppress because the dispatch that directed Officer Leach to defendant's location could not have, by itself, justified a warrantless search and seizure. The defendant disputes the trial justice's conclusion that Officer Leach rightly stopped and searched him based primarily upon an unsubstantiated tip from an informant who refused to give any identifying information or provide a written statement to the police. This result, defendant contends, contravenes the United States Supreme Court's seminal decision in *Florida v. J.L.*, 529 U.S. 266 (2000), in which the Court held that a *Terry*

stop based on an unsubstantiated anonymous tip was unconstitutional.[8] The defendant argues that, as in *J.L.*, the anonymous tip in this case "provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility." *J.L.*, 529 U.S. at 271.

Moreover, defendant notes that Officer Leach did not conduct an independent investigation to corroborate the tip and failed to observe any other criminal behavior or furtive gestures prior to the seizure. The defendant also contests the weight that the trial justice placed on defendant's location in a "high-crime" neighborhood.

In response, the state distinguishes *J.L.* from the case at bar on the basis that Artie was an eyewitness who had firsthand knowledge of the criminal activity in question. The state additionally asserts that Officer Leach's ability to ascertain Artie's identity made the tip non-anonymous and, therefore, more reliable. Primarily, the state reiterates the factors that the trial justice articulated at the hearing on the motion to suppress—namely, defendant's location in "one of the higher crime rate areas in Pawtucket" at 1:00 a.m., Officer Leach's law enforcement experience, the fact that Officer Leach could not see defendant's hands when he arrived on the scene, and defendant's noncompliance with Officer Leach's commands. The state

---

[8] We refer to a *Terry* stop colloquially, assuming that this term holds a sufficiently established place in our legal lexicon. *See Terry v. Ohio*, 392 U.S. 1 (1968).

concludes that these factors, weighed in their totality, correctly led the trial justice to deny defendant's motion to suppress.

**The Seizure**

The threshold inquiry for this Court in assessing the constitutionality of Officer Leach's encounter with defendant is to identify the moment defendant was seized for Fourth Amendment purposes. *See State v. Foster*, 842 A.2d 1047, 1050 (R.I. 2004) ("Whenever a police officer detains a person, 'even if briefly, the Fourth Amendment is implicated and the detention must conform with the strictures of that amendment.'" (brackets omitted) (quoting *State v. Bjerke*, 697 A.2d 1069, 1071 (R.I. 1997))). The timing of the stop sets the bounds for our reasonable-suspicion analysis because reasonable suspicion must exist at the inception of the stop; therefore, only those factors present prior to and leading up to the moment of seizure may be considered. *See State v. Casas*, 900 A.2d 1120, 1133 (R.I. 2006) (noting that to evaluate the reasonableness of a *Terry* stop, this Court must determine "whether the officer's action was justified at its inception") (quoting *Terry*, 392 U.S. at 20); *United States v. Pontoo*, 666 F.3d 20, 26 (1st Cir. 2011) ("To be justified at its inception, a *Terry* stop must be accompanied by reasonable suspicion.").

In his decision, the trial justice did not articulate the specific moment he deemed defendant to have been seized. However, the trial justice considered defendant's reach for his waistband and defendant's noncompliance with Officer

- 10 -

Leach's command to turn around during his totality of the circumstances analysis of reasonable suspicion, which indicates that the trial justice perceived the moment of seizure to be Officer Leach's physical apprehension of defendant, as the state had argued immediately before the trial justice issued his decision.

On appeal, the state maintains that defendant was seized when Officer Leach placed him in the full nelson. The state cites caselaw from the United States Supreme Court, which provides that "[a] police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned." (Quoting *Brendlin v. California*, 551 U.S. 249, 254 (2007).) Accordingly, the state argues that, until Officer Leach deployed physical force, the encounter was merely an attempted seizure because defendant disobeyed Officer Leach's command to walk backward and, therefore, never submitted to his authority.

The defendant contends that he was seized when Officer Leach told him to stop and put his hands up. At that point, defendant argues, he had no option other than to accompany Officer Leach and follow his commands. Therefore, according to this Court's previous holdings, defendant was seized. We agree.

It is our opinion that defendant was seized the moment that Officer Leach ordered defendant to show his hands and defendant complied. *See Thompson v.*

*Whitman*, 85 U.S. 457, 471 (1873) ("A seizure is a single act, and not a continuous fact."). Our caselaw is clear that "[a] police officer has 'seized' a person, within the meaning of the Fourth Amendment, when he restrains that person's freedom to walk away." *Foster*, 842 A.2d at 1050; *see State v. Jimenez*, 33 A.3d 724, 732 (R.I. 2011) ("It is a fundamental principle that a person is seized * * * for Fourth Amendment purposes if, in view of all the circumstances, a reasonable person would believe that he or she was not free to leave." (brackets omitted) (quoting *State v. Vieira*, 913 A.2d 1015, 1020 (R.I. 2007))). The test for whether a person feels free to leave is "objective" and, therefore, is based on "what a reasonable person would think in similar circumstances." *See State ex rel. Town of Little Compton v. Simmons*, 87 A.3d 412, 416 (R.I. 2014) (quoting *State v. Aponte*, 800 A.2d 420, 426 (R.I. 2002)). Restraint of individual liberty is the hallmark of a Fourth Amendment seizure because the United States Supreme Court has recognized that, although a person may be physically unrestrained, they may not, in reality, feel free to go. *See Terry*, 392 U.S. at 19 n.16 ("Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred.").

It is objectively reasonable that, having been caught in the headlights of a police cruiser and ordered by a uniformed officer to raise his hands, defendant would not have felt free to leave. *See Simmons*, 87 A.3d at 416. Indeed, Officer Leach

confirmed on cross-examination that it was "fair to say" that "[defendant] was not free to go" once he issued the command and defendant raised his hands.[9] The state also concedes that defendant obeyed this initial instruction.

As such, we hold that defendant was seized once he complied with Officer Leach's order to raise his hands because, in that moment, his liberty was sufficiently curtailed to implicate his Fourth Amendment rights.[10] *See Foster*, 842 A.2d at 1050.

---

[9] Officer Leach testified on direct examination that, "I gave verbal commands to the male to show me his hands" and that, "He complied. He showed me his hands." When asked what he did next, the officer responded, "I told him to turn around, face away from me, and walk backwards to the sound of my voice, keeping your hands up." On cross-examination, Officer Leach responded affirmatively to the question whether the first thing he told defendant was "Stop, get your hands up." The trial justice, in reciting the salient "factors" elicited from the witnesses, spoke of Officer Leach arriving at the scene in a cruiser, wearing a uniform: "[T]here's no secret here that he's a cop. He issues commands, Put your hands up."

To the extent that there is a discrepancy between the commands, "Show me your hands," and "Put your hands up," it is immaterial to our analysis. No matter the precise wording, it was clearly an authoritative direction issued by a law enforcement officer.

[10] Furthermore, we disagree with our dissenting colleagues, who contend that defendant's actions after he put his hands up not only terminated the seizure, but constituted an intervening event, creating a new basis to arrest defendant, that attenuated a so-called "second" seizure from the illegality of the "first."

There was no "second seizure." The defendant's failure to turn around and walk backward, even in "deliberate[] noncomplian[ce]" with this component of Officer Leach's orders, did not vitiate his overall submission to Officer Leach's show of authority. Indeed, Officer Leach agreed on cross-examination that, despite defendant's partial noncompliance, he perceived defendant as nevertheless "[s]ubmissive to [his] authority" because defendant was walking forward. Nor do we believe that defendant's turning around and reaching toward his waistband constituted an intervening event sufficient to attenuate the seizure's fruits from its illegality.

- 13 -

## Reasonable Suspicion

Under the Fourth Amendment and the corollary exclusionary rule, if an officer lacks reasonable suspicion at the initiation of a warrantless search and seizure, then any evidence obtained therefrom must be suppressed. *See State v. Ditren*, 126 A.3d 414, 420 (R.I. 2015) ("The exclusionary rule, when applicable, bars the introduction of evidence obtained from illegal searches and seizures.").

At a motion-to-suppress hearing, the state bears the burden to establish reasonable suspicion by a preponderance of the evidence. *See State v. Tavarez*, 572 A.2d 276, 279 (R.I. 1990) ("[T]he 'fair preponderance' standard employed by the Supreme Court * * * places a sufficient burden upon the state at a Fourth Amendment suppression hearing [to establish reasonable suspicion]."); *see also Illinois v. Wardlow*, 528 U.S. 119, 140 (2000) (Stevens, J., concurring in part and dissenting in part) ("It is the State's burden to articulate facts sufficient to support reasonable suspicion.").

*Terry* provides that a police officer may conduct an investigatory stop of an individual whom the officer reasonably suspects to be engaged in criminal activity. *Terry*, 392 U.S. at 30. The officer's suspicion is reasonable when the officer has "specific and articulable facts that the person detained is engaged in criminal activity." *Abdullah*, 730 A.2d at 1076 (quoting *Halstead*, 414 A.2d at 1147). To pass constitutional muster, reasonable suspicion must be present at the inception of

the stop, and therefore everything that occurs after the stop cannot factor into the reasonable suspicion analysis. *See Casas*, 900 A.2d at 1133.

At the outset, we observe that the crux of the parties' disagreement before this Court is whether Artie was an anonymous or known informant and whether her information was sufficiently reliable to buoy the quantum of evidence for reasonable suspicion. However, as the trial justice astutely observed at the hearing on the motion to suppress, "There is nothing in this record about an anonymous tip. Nothing. Nobody testified to an anonymous tip." We agree with the trial justice, and therefore reject defendant's contention that "this case falls squarely under *J.L.* and its progeny[.]"

Indeed, the facts here indicate that Officer Leach initiated the stop and seized defendant in objective reliance on the information conveyed to him by the dispatcher. This is reflected in Officer Leach's testimony at the hearing on the motion to suppress:

> "[DEFENSE COUNSEL]: [W]ithout the anonymous tip, sir, that you received through dispatch, you did not see anything at [the moment of the stop] which indicated any kind of criminality, correct?
>
> "[OFFICER LEACH]: I go off what dispatch tells me, sir.
>
> "* * *
>
> "[DEFENSE COUNSEL]: And the only thing you had to go on at that point was some anonymous tip, right?

"[OFFICER LEACH]: I didn't know where the tip came from. I was dispatched by my dispatcher.

"* * *

"[DEFENSE COUNSEL]: You had no way of knowing whether this information was reliable or not. True?

"[OFFICER LEACH]: Again, I'm dispatched to a call, I don't know where the call comes from. I go off what my dispatcher tells me."

Officer Leach further stated that, upon arriving at the scene, he immediately stopped defendant without conducting any independent investigation or assessment of the alleged criminal activity. He conceded that he could not see defendant's hands to confirm the report that defendant was holding a gun:

"[PROSECUTOR]: Upon turning onto Dunnell Avenue, what did you observe?

"[OFFICER LEACH]: I observed one male in the area matching the description given by dispatch.

"* * *

"[PROSECUTOR]: At that point did you see any items in this individual's hands?

"[OFFICER LEACH]: I did not.

"* * *

"[OFFICER LEACH]: I'm sorry. I couldn't see his hands at the time.

"[PROSECUTOR]: What did you do upon observing this male?

- 16 -

"[OFFICER LEACH]: I notified dispatch that I would be out with one, 'one,' meaning one individual, and I put the car in park and exited my vehicle out my driver door.

"[PROSECUTOR]: Upon exiting your vehicle, what did you do?

"[OFFICER LEACH]: I gave verbal commands to the male to show me his hands."

This testimony makes clear that Officer Leach stopped defendant in "objective reliance" on the dispatch. *See United States v. Alvarez*, 40 F.4th 339, 352 (5th Cir. 2022) ("Officers may conduct an investigatory stop in reliance on information issued through police channels, such as a wanted flyer or bulletin or a radio dispatch, if the information is based on 'articulable facts supporting a reasonable suspicion that the wanted person has committed an offense.' * * * But if the information 'has been issued in the absence of a reasonable suspicion, then *a stop in the objective reliance upon it* violates the Fourth Amendment.'" (emphasis added) (quoting *United States v. Hensley*, 469 U.S. 221, 232 (1985))).

Unfortunately, there is a dearth of evidence in the record concerning the "dispatch." The state did not present the individual who issued the dispatch as a witness at the hearing on the motion to suppress, and the record contains no information as to that individual's identity. Similarly, we know nothing about how this person came to acquire the information furnished by the individual identified as Artie.

- 17 -

The state also failed to submit any further evidence of Artie's identity beyond her first name, establish whether she had a relationship or connection to defendant, demonstrate how and when the police came to know her identity and address, or specify the manner she used to contact the police—specifically, whether she used the 911 system. Together, these pivotal facts help courts to classify someone as a citizen informant, which then permits a presumption that the individual's information is more reliable. *See United States v. Kehoe*, 893 F.3d 232, 238 (4th Cir. 2018) ("[C]ourts generally presume that a citizen-informant or a victim who discloses his or her identity and basis of knowledge to the police is both reliable and credible."). Furthermore, the state never attempted to introduce Artie's information as a "tip" at the motion-to-suppress hearing. *See Tavarez*, 572 A.2d at 279. The trial justice picked up on this omission and rebuked both parties for categorizing Artie's information as a tip. Indeed, he stated that "the record is devoid of any solid evidence of it * * *."

Before this Court, the state argues that the ability to ascertain the identity of a reporting party is a factor that contributes favorably to the totality of reasonable suspicion. However, the state did not adduce any evidence of methods that the police apparently used to track Artie's identity and location, and so this argument falls flat. In the same vein, the state refers to Artie as the "female 911 caller" in its written submissions to this Court, and yet no evidence was introduced at the suppression

hearing to show that Artie used 911 to contact the dispatcher. This was a significant lapse on the state's part because, indeed, use of the 911 system heightens the reliability of a caller's information. *See, e.g.*, *People v. Brown*, 353 P.3d 305, 315 (Cal. 2015); *State v. Golotta*, 837 A.2d 359, 367 (N.J. 2003). But without evidence of a 911 call in the record, the state's attempt to analogize the present matter with 911-caller cases, like *Navarette v. California*, 572 U.S. 393 (2014), is unavailing.

It appears that the state is asking this Court to presume that Artie was a reliable citizen informant, despite its failure to introduce any evidence that would assist us in classifying her as such. *Cf. State v. Williams*, 193 S.W.3d 502, 508 (Tenn. 2006) (affirming the trial court's decision that the defendant's girlfriend was not "presumptively reliable as a citizen informant" because the state's affidavit "did not establish that [she] provided the information as a law-abiding citizen motivated solely by a sense of civic duty"); *State v. Marcus*, 660 N.W.2d 837, 842 (Neb. 2003) ("The status of a citizen informant cannot attach unless the affidavit used to obtain a search warrant affirmatively sets forth circumstances from which the informant's status as a citizen informant can reasonably be inferred."); *State v. Maynard*, 783 So. 2d 226, 230 (Fla. 2001) (classifying the tipster as a "citizen informant" based on facts in evidence that the tipster identified herself as "the mother of the suspect, thereby demonstrating the basis of her knowledge" and that the tipster "disclosed her address and made her identity easily ascertainable").

- 19 -

If the state intended to hang its hat on Artie's eyewitness account of defendant's activities, it should have substantiated that her phone call was a proper "tip" and accompanied that submission with appropriate supporting evidence, such as a recording of the call, the method used to place the call, any prior relationship between Artie and defendant, or the dispatcher as a testifying witness. *See State v. Farman*, 600 A.2d 1003, 1003 (R.I. 1991) (mem.) (ordering reversal of the judgment of conviction because "no evidence was presented at trial concerning the source or nature of the tip received by the Attleboro police[,]" which they relied on to make the investigatory stop).

The facts before us reveal that Officer Leach had no independent basis, based on his own observations or investigation, to suspect that defendant was engaged in criminal activity. As he candidly acknowledged, he responded in total reliance on the dispatch: "I go off what dispatch tells me[.]"[11]

Because no evidence was produced concerning the reliability of the information that defendant was seen waving a gun, the quantum of evidence before the trial justice did not amount to a reasonable suspicion that defendant was or had been engaged in criminal activity. The fact that the description provided in the dispatch matched defendant was not enough. *See Burgess*, 138 A.3d at 202 ("An

---

[11] Although Officer Leach detected no suspicious or criminal activity, he approached defendant: "[H]e was the only male in the area, so it was a little more than a hunch on my part."

- 20 -

accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity." (quoting *J.L.*, 529 U.S. at 272)).

### The Totality of the Circumstances

This Court determines the constitutionality of an investigatory stop under a totality of the circumstances analysis. *See Tavarez*, 572 A.2d at 278 (adopting the holding expounded by the United States Supreme Court in *Cortez*, 449 U.S. at 417, which held that *Terry* stops should be subject to a totality review). When considering the facts in their totality, "[w]e recognize that numerous factors may arise and coalesce to contribute to an officer's finding of reasonable suspicion of criminal conduct." *State v. Taveras*, 39 A.3d 638, 647 (R.I. 2012).

Apart from the dispatch, the trial justice cited several other factors that he found constituted sufficient reasonable suspicion to justify the stop. Specifically, the trial justice noted the time of night, the intersection's location in a high-crime area, defendant's noncompliance, defendant's reach for his waistband, and, perhaps most importantly, Officer Leach's thirty years of combined experience as a law enforcement officer. To be sure, these were all permissible factors for the trial

justice to consider. *See Abdullah*, 730 A.2d at 1077. Under the specific facts of this case, however, the trial justice's analysis becomes problematic.

First, some of the facts that the trial justice found particularly influential, in our opinion, bear little weight in a totality analysis because they occurred after defendant was seized. We refer specifically to the fact that defendant disobeyed Officer Leach's order to walk backward and the fact that he reached toward his waistband. We are satisfied that such actions do not constitute intervening events sufficient to remedy the lack of reasonable suspicion for the initial seizure. *See Casas*, 900 A.2d at 1133 ("We must determine 'whether the officer's action was justified at its *inception*, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.'" (emphasis added) (quoting *Terry*, 392 U.S. at 20)).

Second, by his own characterization, several of the factors the trial justice enumerated focused on "all of the circumstances in Leach's mind." As established *supra*, the focus should also have been on the circumstances underlying the dispatch. *See Hensley*, 469 U.S. at 233 ("Assuming the police make a *Terry* stop in objective reliance on a flyer or bulletin, we hold that the evidence uncovered in the course of the stop is admissible if the police who *issued* the flyer or bulletin possessed a reasonable suspicion justifying a stop * * *.").

According to Officer Leach's own testimony, his sole justification for the seizure was the dispatch. There is no debate that reasonable suspicion was required at the inception of the seizure. In rebutting defendant's motion to suppress, the state provided no information as to the identity of the dispatcher, nor was that individual examined as a witness at the motion-to-suppress hearing. As for Officer Leach, we know that he acted primarily on the dispatch information, which contained only the description of defendant and the information that he was walking with a gun. Moreover, this information was not buttressed by sufficient evidence to carry any significant weight.

The evidentiary bar may not be high; nevertheless, the quantum of evidence must rise to the level of reasonable suspicion. Here, Officer Leach had no independent reason to suspect that defendant was engaged, or had been engaged, in any illegal activity other than his reliance on the dispatch. The dispatch, however, lacked sufficient evidence of reliability such that it created a reasonable suspicion that criminal activity wase afoot.

We deem this to be a failure of proof. "[T]he [state] must prove that the source of the information is something other than the imagination of the [dispatcher] who does not become a witness." *Brown*, 353 P.3d at 316 (quoting *People v. Madden*, 471 P.2d 971, 1021 (Cal. 1970)). Such lack of evidence can be easily remedied by

producing the dispatcher as a witness or by introducing a recording of the 911 call, if that indeed was the source of the information underlying the dispatch. *Id.*

When "[a]pplying the reasonableness standard embodied in the Fourth Amendment, the Supreme Court has balanced the intrusion on the defendant's privacy with the opposing interests of law enforcement in crime prevention and detection and the police officer's safety." *Foster*, 842 A.2d at 1050. The true issue in this case, therefore, is not whether Officer Leach acted reasonably, but whether the defendant's Fourth Amendment rights were violated. We hold that the defendant's rights were indeed infringed because the state failed to submit adequate evidence to show that reasonable suspicion existed at the inception of his encounter with Officer Leach.

# IV

## Conclusion

For the foregoing reasons, we reverse the decision of the Superior Court denying the defendant's motion to suppress the evidence obtained as a result of the unconstitutional search and seizure; we likewise vacate the judgment of conviction. This case is remanded to the Superior Court for further proceedings consistent with this opinion.

**Justice Goldberg, with whom Justice Robinson joins, dissenting.** "For 'what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures.'" *Terry v. Ohio*, 392 U.S. 1, 9 (1968) (quoting *Elkins v. United States*, 364 U.S. 206, 222 (1960)).

This appeal presents a seemingly straightforward application of *Terry*'s core Fourth Amendment principle: A police officer is dispatched at approximately 1 a.m. to an intersection in a known high-crime neighborhood for a report of a man walking with or waving a gun. The officer races to the intersection and discovers a man in the precise area described; and, in the words of the trial justice who conducted the suppression hearing, the man "fits the description to a T, right down to the shirt." No other persons are in the vicinity. From his vantage point, the officer is unable to see the man's hands; thus, as the officer alights from his police cruiser, and without drawing his service weapon, he orders the suspect to "show me [your] hands." The man complies, and Fourth Amendment jurisprudence dictates that this submission to an assertion of lawful authority is a seizure that must be supported by a reasonable suspicion "that criminal activity may be afoot * * *." *Terry*, 392 U.S. at 30.

The majority holds that, under the circumstances described, Officer James Leach of the Pawtucket Police Department (PPD) lacked "reasonable suspicion" to detain defendant, Napoleao Pires. I respectfully but firmly disagree with this conclusion, which the majority reaches through a series of legal errors.

Considering the circumstances, the majority incorrectly concludes that Officer Leach lacked reasonable suspicion to briefly detain Pires during the early morning hours in order to investigate a report that Pires was in unlawful possession of a firearm. In reaching this result, the majority focuses upon the absence of certain information, but *Navarette v. California*, 572 U.S. 393 (2014), as well as our own precedent, mandates consideration of the totality of the circumstances, including three factors discussed in *Navarette*. The majority departs from this critical focus.

While it is my firm conviction that Officer Leach possessed the requisite reasonable suspicion to effectuate the above-described seizure, the majority compounds its error by failing to recognize certain post-seizure intervening acts committed by Pires in defiance of Officer Leach's lawful authority. Pursuant to established United States Supreme Court precedent, a suspect who fails to submit to legal authority is not seized for Fourth Amendment purposes. *See California v. Hodari D.*, 499 U.S. 621, 626 (1991). After initially complying with Officer Leach's instruction to raise his hands, i.e., the seizure, Pires continued to walk toward Officer Leach but refused repeated directives to walk backward. When Pires was twelve to fifteen feet away from Officer Leach, Pires deliberately committed three *simultaneous* acts, which individually and cumulatively made clear that Pires was no longer submitting or surrendering to legal authority: Pires spun around (so his back was facing Officer Leach); he lowered his hands (in contravention of Officer

- 26 -

Leach's direction to keep his hands raised and in sight); and he reached into his front waistband (where a Smith & Wesson M&P .40-caliber firearm was secreted). Although the majority brushes aside these noncompliant life-threatening intervening actions with almost no discussion, Pires's actions are unequivocal—he was no longer surrendering to authority—and, consistent with *Hodari D.*, the seizure terminated. The majority opinion fails to address these intervening events, *Hodari D.*, or the concomitant Fourth Amendment implications.

After witnessing Pires reach into his waistband, Officer Leach applied physical force to restrain him. At this moment Officer Leach once again seized Pires and soon discovered the firearm and the controlled substances, which were the subject of the motion to suppress. Even assuming *arguendo* that the initial seizure violated the Fourth Amendment, as the majority concludes, the intervening actions that preceded the subsequent seizure and the discovery of contraband were sufficiently attenuated. As such, the firearm and controlled substances are not subject to the exclusionary rule, but rather fall within an exception to that rule, the attenuation doctrine. *See Utah v. Strieff*, 579 U.S. 232, 238 (2016).

While this appeal presents a number of Fourth Amendment issues, at bottom the majority's conclusion that the circumstances presented during this early morning encounter with a man reportedly openly displaying a firearm in a high-crime neighborhood did not permit a brief investigatory stop is alarming and inconsistent

with core constitutional principles. The entire purpose of the *Terry* stop is to allow law enforcement officers to maintain the status quo and pursue a brief investigation into suspicious activity without fear of violence. "So long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose." *Adams v. Williams*, 407 U.S. 143, 146 (1972) (footnote omitted). Here, Officer Leach had reason to believe defendant was armed because that information had been conveyed through a contemporaneous citizen call to dispatch; and Officer Leach had reasonable suspicion to conclude defendant was committing a crime because in Rhode Island it is unlawful to carry a firearm on one's person without a license. *See* G.L. 1956 § 11-47-8(a). This was a simple *Terry* stop and frisk at its inception.

Because Officer Leach appropriately possessed reasonable suspicion that Pires was violating the law and believed that Pires was armed, Officer Leach reasonably ordered Pires to stop and show his hands. This initial seizure lasted seconds and under the circumstances was unquestionably reasonable. I would affirm the trial justice.

# I

## Facts

The facts are taken from the hearing on the motion to suppress. On July 9, 2016, at approximately 1 a.m., Officer Leach of the PPD received a dispatch for a report of a light-skinned black male wearing a striped shirt and dark pants in possession of a gun[1] at the intersection of Dunnell Avenue and Sisson Street, a neighborhood in Pawtucket that Officer Leach associated with a high crime rate. On the date of the incident, Officer Leach had over twenty-five years of law enforcement experience, including twenty-three years as an active-duty military police officer in the United States Army and approximately three years with the PPD. At that time, Officer Leach had worked for approximately two years "just" in the Dunnell Avenue and Sisson Street district, and only in the late evening to early morning hours. Officer Leach responded to the dispatch; and, upon arrival at the designated intersection, he encountered only one individual, later identified as defendant.

According to Officer Leach, Pires "match[ed]" the description provided by dispatch; he was a "light-skinned to dark-skinned black male, wearing a striped shirt, dark pants." And, as the trial justice recounted in denying the motion to suppress,

---

[1] As the majority points out, the record contains alternating descriptions of the dispatch call, i.e., "a man waving a gun" or "a man with a gun." These minor discrepancies are immaterial for present purposes.

"nobody else is around except this defendant, and he fits the description to a T, right down to the shirt."

Officer Leach was unable to see defendant's hands; thus, as he alighted from his marked patrol vehicle and, without removing his service weapon, he ordered Pires to "show me [your] hands." Pires complied, and for Fourth Amendment purposes he was seized. I refer to this as the "first seizure." As events soon demonstrated, Pires's compliance was fleeting and, as the trial justice found, Pires disobeyed or actively resisted every ensuing directive from Officer Leach.

Officer Leach testified that, approximately five to ten seconds after Pires raised his hands, he instructed Pires to "turn around, face away from me, and walk backwards to the sound of my voice, keeping your hands up." It is undisputed that Pires failed to fully comply with Officer Leach's direction. Pires walked toward Officer Leach but failed to heed the instruction that he walk backward. In the words of Officer Leach, Pires "walked facing -- he walked towards me facing me." This first act of noncompliance was not inconsequential.

Officer Leach testified that, in the next five to seven seconds, he "continued to give [Pires] commands [to turn around and walk backward], and once I realized he was either not complying or didn't understand me, as he got within 12 to 15 feet of me, he turned around and put his back to me and reached towards his waistband."

Officer Leach elucidated that, upon witnessing this potentially life-threatening act of defiance, his "concern was that [Pires] was attempting to pull a firearm."

Confronted with these circumstances—a report of an armed male, at approximately 1 a.m., in a high-crime neighborhood with no backup in sight, who had lowered his hands while turning his back and reaching into his waistband (where the firearm subsequently was seized)—Officer Leach recounted that he considered two options: "I could either wait for him to turn back around with possibly a firearm, or I could try to incapacitate him prior to the retrieval of a firearm." In a "split-second decision," Officer Leach ran toward Pires—who at this point had his back to Officer Leach—and incapacitated Pires's arms through the use of a full-nelson hold. There is no question that, at this moment, Pires's freedom of movement was once again restrained and that for Fourth Amendment purposes, Pires was "seized." I refer to this moment as the "second seizure," which led to a lawful arrest.

Within seconds, Officer Matthew Levasseur and another officer arrived on scene. While maintaining the full-nelson hold, Officer Leach instructed Officer Levasseur to check Pires's waistband. Officer Levasseur did so and immediately yelled "gun." After Officer Levasseur secured the firearm, Officer Leach escorted Pires to the ground and placed him in handcuffs. This was a lawful arrest. In addition to the firearm, a search incident to arrest discovered crack cocaine and a

- 31 -

white powdery substance, which Officer Leach testified, appeared to be cocaine. During the suppression hearing, Officer Leach related that the entire event—from the moment he directed Pires to show his hands until Pires was placed on the ground—lasted approximately thirty to thirty-five seconds. *Thirty-five seconds*.

Officer Leach testified that he subsequently visited the reporting party's home; although "she did not want to complete a written statement," her identity (Artie) was ascertained by the PPD.

At the suppression hearing, Pires testified; his account differed from Officer Leach's in several important respects. Pires denied hearing Officer Leach's persistent command that he turn around and walk backward toward the sound of Officer Leach's voice. Although Pires's first language was Cape Verdean Creole, Pires nonetheless acknowledged that, if Officer Leach had directed him to walk backward, he would have understood that instruction "[b]ecause that's a simple thing, and you understand those words."

Pires also contradicted Officer Leach's account regarding the events immediately preceding the second seizure. Specifically, Pires averred that he never turned his back on Officer Leach, never lowered his hands, and never reached toward his waistband. Pires instead testified that, as he walked toward Officer Leach, he advised Officer Leach that he was in possession of a firearm. After doing so, Pires explained that he was allowed to continue walking toward Officer Leach (with the

gun still hidden in the waistband) and that Officer Leach "let me walk by." Pires further related that he continued to walk forward—now with Officer Leach behind him and the firearm still in his waistband—until he reached one of the patrol vehicles, where he was taken into custody.

The trial justice resolved these factual discrepancies, expressly crediting Officer Leach's testimony and explicitly finding that Pires was "deliberately noncompliant" when "he did not turn and walk backwards." As a matter of fact, the trial justice also determined that Pires "turned his back on [Officer] Leach" and "reached for his [own] waist area * * *." The trial justice found Pires not credible and specifically rejected Pires's account that he alerted Officer Leach to the presence of the concealed weapon, stating: "I just don't believe, however, that the defendant flat out told [Officer] Leach that he had a gun at the outset. I disbelieve that assertion, and I credit [Officer] Leach's testimony."[2]

The trial justice performed a careful review of the evidence in light of established precedent from the United States Supreme Court and this Court concerning the determination of reasonable suspicion. He flatly rejected the defense's contention that this case concerned an anonymous tip, and in doing so

---

[2] I pause to note that the majority opinion makes little reference to the trial justice's finding or Pires's noncompliant actions. This is a significant shortcoming that affects the Fourth Amendment analysis. The trial justice's factual findings are entitled to deference on appeal and contravene the majority's seizure conclusion. *See infra*.

referenced the factors discussed in *State v. Abdullah*, 730 A.2d 1074 (R.I. 1999), and

observed:

> "Some of the factors that may contribute to a reasonable suspicion of criminal activity include the location in which the conduct occurred -- that applies to our case -- the time at which the incident occurred -- that applies to our case -- the suspicious conduct or unusual appearance of the suspect -- that may contribute to our case as well -- and the personal knowledge and experience of the police officer. That applies here. [Officer] Leach is a 30-year veteran: 23-odd years as a military policeman, another six years as a Pawtucket police officer. That's almost 30 years as a law enforcement officer." (Internal quotation marks omitted.)

Thereafter, the trial justice focused on the critical moment prior to the second

seizure:

> "[T]here's no question in my mind that under the totality of the circumstances, and given the factors presented that I've talked about, to an experienced law enforcement officer like [Officer] Leach, reasonable suspicion was present to detain this man. When [Pires] turned his back on [Officer] Leach, and I expressly find that to be the case, and reached for his waist area, alarms went off, and rightly so under all of the circumstances in [Officer] Leach's mind. And he feared that the defendant had a lethal weapon and that [Officer] Leach would be in serious harm's way, as he physically wrapped the defendant up and waited for back-up, which he knew would arrive shortly."

Accordingly, the trial justice concluded that the second seizure was supported by

reasonable suspicion and that the gun and controlled substances were properly

seized. The trial justice denied the motion to suppress the evidence.

## II

## Standard of Review

"When confronted with a decision denying a motion to suppress evidence, the Supreme Court accords deference to a trial justice's findings of historical fact." *State v. Casas*, 900 A.2d 1120, 1129 (R.I. 2006). Although a trial justice's findings of fact are accorded "deference," this Court "will not hesitate to overturn those findings if the trial justice overlooked or misconceived material evidence or otherwise clearly was wrong and violated a defendant's constitutional rights." *Id.* The majority opinion does not contest the trial justice's findings. We afford *de novo* review "to determine the existence or nonexistence of a reasonable articulable suspicion justifying" a stop. *Id.*

## III

## Fourth Amendment Search and Seizure

The Fourth Amendment prohibits "unreasonable searches and seizures," U.S. Const. Amend. IV, and it is well established that this constitutional requirement "applies to seizures of the person, including brief investigatory stops * * *." *Casas*, 900 A.2d at 1131 (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). Although law enforcement officers ordinarily must obtain a warrant based upon probable cause before making an *arrest*, in *Terry*, the United States Supreme Court recognized an exception that allows a police officer to conduct a brief investigatory

- 35 -

stop in limited circumstances. *See Terry*, 392 U.S. at 30.

Pursuant to *Terry* and its progeny, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). *Terry* provides that "a law enforcement officer, for his own protection and safety, may conduct a patdown to find weapons that he reasonably believes or suspects are then in the possession of the person he has accosted." *Ybarra v. Illinois*, 444 U.S. 85, 93 (1979). The reasonable suspicion that justifies a *Terry* stop likewise justifies a protective frisk of the suspect when an officer has reason to believe that the suspect may pose a danger to the officer. *Terry*, 392 U.S. at 30.

*Terry*'s teachings are an integral part of Rhode Island's search and seizure jurisprudence. This Court has explicated that "[t]o be valid, an investigatory stop of a person or vehicle must be based on 'some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity.'" *Casas*, 900 A.2d at 1131 (quoting *Cortez*, 449 U.S. at 417). "To determine whether the suspicions of a police officer 'are sufficiently reasonable to justify an investigatory stop, [a court] must take into account the totality of the circumstances.'" *Id.* (quoting *State v. Keohane*, 814 A.2d 327, 330 (R.I. 2003)).

For Fourth Amendment purposes, I agree that Pires was seized, albeit for only seconds, when he initially complied with Officer Leach's directive to "show me

[your] hands." The question that must be determined is whether, at that point, it was "reasonable" for Officer Leach "to have interfered with [Pires's] personal security as he did." *Terry*, 392 U.S. at 19. "[I]n determining whether the seizure * * * [was] 'unreasonable' our inquiry is a dual one—whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 19-20. This Court has recognized that "[a] brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." *State v. Halstead*, 414 A.2d 1138, 1146 (R.I. 1980) (quoting *Adams*, 407 U.S. at 146).

"[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. In so doing, "it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?" *Id.* at 21-22 (internal quotation marks omitted). Thus, the inquiry into whether a police officer's suspicions "are sufficiently reasonable to justify an investigatory stop * * * must take into account the totality of the circumstances." *Casas*, 900 A.2d at 1131 (quoting *Keohane*, 814 A.2d at 330).

# A

## Officer Leach Conducted a Lawful *Terry* Stop

Before addressing my disagreements with the majority opinion, I highlight two significant points of agreement.

First, the Court is unanimous that the citizen call or tip (Artie's tip) reporting a man with a gun did not emanate from an anonymous source. Whatever questions may exist concerning the method Artie used to contact the PPD or the manner in which Artie's name and home address were identified, which facts are not in evidence, the Court is in agreement that, because Artie was not an anonymous source, *Florida v. J.L.*, 529 U.S. 266 (2000), is inapplicable. Second, the Court is unanimous that Officer Leach acted in objective reliance on the dispatch call when he responded to the intersection of Dunnell Avenue and Sisson Street. These points of agreement are significant and, as will be discussed below, when applied to well-settled Fourth Amendment precedent, should result in affirming the trial justice's decision.

My divergence begins with the inexplicable near-absence from the majority opinion of the leading, most recent, and binding precedent from the United States Supreme Court, *Navarette*. Similar to the case *sub judice*, *Navarette* concerned law enforcement officers effectuating a seizure based upon a police dispatch, which originated from a citizen report or tip. *See Navarette*, 572 U.S. at 395. But for a

passing reference, the majority opinion ignores *Navarette* and departs from its precedent in at least two consequential respects. *Navarette* directs us to consider two questions.

First, we are directed to consider whether the citizen report or tip is "sufficiently reliable to credit the [caller's] allegation * * *." *Navarette*, 572 U.S. at 398. In determining reliability, "[t]he standard takes into account 'the totality of the circumstances—the whole picture.'" *Id.* at 397 (quoting *Cortez*, 449 U.S. at 417). While the majority purports to apply this all-inclusive standard, its analysis improperly and narrowly centers on the *absence* of certain information. *Navarette* employed the totality of the circumstances test but focused on the *presence* of information, including three factors not considered by the majority. *Id.* at 399-400.

Second, "[e]ven a reliable tip will justify an investigative stop only if it creates reasonable suspicion that 'criminal activity may be afoot.'" *Navarette*, 572 U.S. at 401 (quoting *Terry*, 392 U.S. at 30). This inquiry requires a determination whether the citizen report or tip "created reasonable suspicion of an ongoing crime * * *." *Id.* In answering this question, the majority gives scant consideration to the circumstances in Officer Leach's mindset and instead focuses on the underlying dispatch. This is simply incorrect. It is well established that circumstances must be "viewed from the standpoint of an objectively reasonable police officer * * *." *Id.* at 402 (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)); *see also State v.*

- 39 -

*Li*, 297 A.3d 908, 917 (R.I. 2023), *cert. denied*, 144 S.Ct. 1057 (2024) ("The United States Supreme Court has made clear that, in order to justify the type of seizure involved in a traffic stop, 'officers need only reasonable suspicion—that is, a particularized and *objective* basis for suspecting the particular person stopped of breaking the law.'") (emphasis added) (quoting *Heien v. North Carolina*, 574 U.S. 54, 60 (2014)). Below, I consider the two *Navarette* inquiries.

## 1

### Artie's Tip Bore Adequate Indicia of Reliability

The majority's conclusion that Officer Leach lacked reasonable suspicion to effect the first seizure is primarily based upon the *absence* of three factors: (1) Officer Leach did not independently observe or investigate any criminal acts committed by Pires but rather seized Pires "in 'objective reliance' on the dispatch"; (2) a dearth of information at the suppression hearing concerning the dispatch and the person who issued the dispatch; and (3) a lack of evidence concerning Artie, except of course, that law enforcement was able to ascertain Artie's first name and home address. The *Navarette* Court considered these same three categories and concluded that the absence of such information did not preclude a determination that a citizen report—even an unidentified caller—was reliable.

In *Navarette*, dispatch relayed to officers the location and description of a vehicle that purportedly "[r]an the reporting party off the roadway[.]" *Navarette*, 572

U.S. at 395. As a result, officers stopped the vehicle, and a subsequent search revealed thirty pounds of marijuana. *Id.* The driver and passenger were arrested, the evidence was seized, and a motion to suppress the evidence was filed, claiming that "the traffic stop violated the Fourth Amendment because the officer lacked reasonable suspicion of criminal activity." *Id.* at 395-96.

Similar to the case at bar, the officers in *Navarette* did not personally witness any conduct (or initiate an investigation) to independently assess whether reasonable suspicion of criminal activity existed; instead—similar to Officer Leach—the officers acted in reliance on the dispatch. *See Navarette*, 572 U.S. at 395. The Supreme Court made clear that such reliance does not violate the Fourth Amendment, and the Court explained that it has "firmly rejected the argument 'that reasonable cause for an investigative stop can only be based on the officer's personal observation, rather than on information supplied by another person.'" *Id.* at 397 (brackets omitted) (quoting *Adams*, 407 U.S. at 147). Thus, contrary to the majority's reasoning, Officer Leach's lack of firsthand knowledge that Pires may have been engaged in criminal conduct is of no moment to determining whether reasonable suspicion existed to effectuate the first seizure.

*Navarette* likewise negates the majority's two remaining considerations—the dearth of information about the dispatch and the person who issued the dispatch, as well as the lack of information known about Artie (except, of course, Artie's first

- 41 -

name and home address).  While the majority laments that little is known about either the citizen caller or the dispatch, *Navarette* exhibited similar absences:

> "Because neither the caller nor the Humboldt County dispatcher who received the call was present at the hearing, * * * the prosecution did not introduce the recording into evidence.  The prosecution proceeded to treat the tip as anonymous, and the lower courts followed suit." *Navarette*, 572 U.S. at 396 n.1.

Again, contrary to the majority's analysis, the lack of information concerning Artie, the dispatch, or the dispatcher was simply not relevant to the determination concerning whether reasonable suspicion existed to effectuate the first seizure.

In juxtaposition to the majority's absence-of-information methodology, *Navarette* applied the opposite approach and recognized the presence of certain information that "bore adequate indicia of reliability for the officer to credit the caller's account." *See Navarette*, 572 U.S. at 398.  Although *Navarette* determined that these considerations collectively supported the reliability of an *anonymous* tip, *id.*, the majority accords these factors endorsed by the Supreme Court no attention when assessing whether Artie's report was reliable.[3]

The first factor was that the call or tip was made in real time.  Although the anonymous 911 caller in *Navarette* did not expressly claim eyewitness knowledge,

---

[3] Other courts have likewise identified and applied these three considerations to support the reliability of an *anonymous* call to dispatch. *See, e.g.*, *United States v. Rose*, 48 F.4th 297, 303 (5th Cir. 2022); *United States v. Bruce*, 977 F.3d 1112, 1117 (11th Cir. 2020); *United States v. Avilés-Vega*, 783 F.3d 69, 74 (1st Cir. 2015).

the Court surmised that by reporting in real time that she had been run off the road by a specific vehicle—and providing a detailed description of the vehicle—"the caller necessarily claimed eyewitness knowledge of the alleged dangerous driving." *Navarette*, 572 U.S. at 399. "That [eyewitness] basis of knowledge," the Court observed, "lends significant support to the tip's reliability." *Id.*

Second, the "timeline of events suggests that the caller reported the incident soon after she was run off the road." *Navarette*, 572 U.S. at 399. In support, the Court compared the vehicle's location when the 911 call was made and the location of the vehicle when officers initiated the stop, a distance of nineteen miles in approximately eighteen minutes. *Id.* The Court noted that this type of "contemporaneous report has long been treated as especially reliable." *Id.* Officer Leach promptly responded to the dispatch.

Third, "[a]nother indicator of veracity is the caller's use of the 911 emergency system." *Navarette*, 572 U.S. at 400. "A 911 call has some features that allow for identifying and tracing callers, and thus provide some safeguards against making false reports with immunity." *Id.* Considering the technological features that allow for the identification of a caller, the Court observed that "a reasonable officer could conclude that a false tipster would think twice before using such a system." *Id.* at 401.

Although the Supreme Court recognized three considerations, "*Navarette* did

not establish an exhaustive set of necessary requirements for an anonymous tip[]. It only identified three factors that, considered in context, made a tip reliable." *United States v. Wright*, 74 F.4th 722, 727 (5th Cir. 2023). Here, two of the three *Navarette* factors are plainly present. Officer Leach repeatedly testified concerning the dispatch: "I was dispatched for a call with a man waving a gun, and a description was given by the dispatcher" and "I was dispatched to the intersection, and dispatch related it was a man with a gun, and it was a light-skinned black male wearing a striped shirt and dark pants."

Following the conclusion of testimony at the suppression hearing, the trial justice rendered his decision and found that the person stopped by Officer Leach matched the physical description and was in the location, as relayed by the dispatch:

> "[Officer] Leach gets a dispatch; the dispatch sends him to what he has testified to is one of the higher crime rate areas in Pawtucket. He's familiar with the area and speaks of a light-skinned black male, wearing a striped T-shirt and dark pants, walking in the area of Dunnell Avenue and Sisson Street with a gun at one o'clock in the morning. [Officer] Leach proceeds with alacrity to the area, and nobody else is around except this defendant, and he fits the description to a T, right down to the shirt."[4]

---

[4] While it is true that the fact that Pires matched the description and location relayed by dispatch does not enter into the equation concerning whether reasonable suspicion existed to conclude that Pires was or had been engaged in criminal activity, "[a]n accurate description of a subject's readily observable location and appearance is * * * reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse." *State v. Burgess*, 138 A.3d 195, 202 (R.I. 2016) (quoting *Florida v. J.L.*, 529 U.S. 266, 272 (2000)); *see also Navarette v. California*, 572 U.S. 393, 399 (2014) (observing that a detailed description of a

- 44 -

Similar to the anonymous tip in *Navarette*, Artie's report relaying defendant's location and detailed description—as well as identifying that defendant was openly displaying a firearm—"necessarily claimed eyewitness knowledge[.]" *Navarette*, 572 U.S. at 399; *see also Wright*, 74 F.4th at 730 ("[T]he tipster * * * told police 'that there was a gold Toyota Corolla * * * at the pavilion in Glen Arbor Park doing a re-up, giving drugs to the transients that deal in that park.' That clears the low bar for reasonable suspicion.") (brackets omitted).

In addition to eyewitness knowledge, the "timeline of events [also] suggests that the caller reported the incident soon after" observing defendant. *See Navarette*, 572 U.S. at 399. Specifically, Artie reported to the PPD that Pires was openly displaying a firearm at the intersection of Dunnell Avenue and Sisson Street; and, when Officer Leach arrived on scene moments later, he located Pires at the intersection of Dunnell Avenue and Sisson Street. The Supreme Court's conclusion that "contemporaneous report[s]" based upon "eyewitness knowledge" have "long been treated as *especially reliable*" and "lend[] significant support to the tip's

---

vehicle "necessarily claimed eyewitness knowledge of the alleged dangerous driving" and "lends significant support to the tip's reliability"); *Illinois v. Gates*, 462 U.S. 213, 234 (1983) ("[A]n informant's * * * explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles his tip to greater weight than might otherwise be the case.").

reliability" applies with equal force to Artie's tip.[5] *Id.* (emphasis added).  This is the

linchpin of a proper Fourth Amendment analysis.

To be sure, there is no evidence that Artie's call to the PPD was made through

the 911 system.  The majority seizes upon this evidentiary omission and suggests

that attempts to analogize this matter with *Navarette*, which did concern an

anonymous 911 call, are "unavailing."  But *Navarette* never hinted that a citizen call

to a police department must utilize the 911 system to be reliable.  In fact, *Navarette*

concluded the precise opposite, observing that an *anonymous* caller's use of the 911

system (remember, Artie is not an anonymous caller) is "*one* of the relevant

circumstances that, *taken together*, justified the officer's reliance on the information

reported in the 911 call." *Navarette*, 572 U.S. at 401 (emphases added); *see also*

*Wright*, 74 F.4th at 728 ("Although the tipster did not use 911, the call was not

completely anonymous.").

---

[5] The majority states: "If the state intended to hang its hat on Artie's eyewitness account of defendant's activities, it should have substantiated that her phone call was a proper 'tip' and accompanied that submission with appropriate supporting evidence, such as a recording of the call, the method used to place the call, any prior relationship between Artie and defendant, or the dispatcher as a testifying witness." None of that is necessary; nor is this evidentiary burden consistent with *Navarette* and the totality of the circumstances test.  In *Navarette*, neither the caller nor the dispatcher testified at the suppression hearing, nor did the prosecution introduce the recording into evidence. *See Navarette*, 572 U.S. at 396 n.1.  Nonetheless, the Court concluded that eyewitness knowledge lent "significant support to the tip's reliability." *Id.* at 399.

While an anonymous call through the 911 system may certainly "allow for identifying and tracing callers, and thus provide some safeguards against making false reports with immunity," *Navarette*, 572 U.S. at 400, Artie's non-anonymous tip to the PPD accomplished similar goals with, at least, comparable safeguards. Artie was not an anonymous caller; she was readily identified and visited at her home by Officer Leach. *See J.L.*, 529 U.S. at 276 (Kennedy, J., joined by Rehnquist, C.J., concurring) ("If an informant places his anonymity at risk, a court can consider this factor in weighing the reliability of the tip."). And, because Artie's method of contacting the PPD led to her identification, if she had provided false information, Artie could have faced criminal prosecution, which provides additional safeguards "against making false reports with immunity."[6] *Navarette*, 572 U.S. at 400; *see also J.L.*, 529 U.S. at 276 (Kennedy, J., joined by Rehnquist, C.J., concurring) ("[T]he ability of the police to trace the identity of anonymous telephone informants may be

---

[6] See G.L. 1956 § 11-32-2, entitled "False report of crime," which provides:

> "Every person who shall knowingly make or cause to be made a false statement of a crime, either oral or written, with intent that it be relied upon by a police officer of any city or town or by any member of the state police, shall be deemed guilty of obstructing an officer and shall be imprisoned not exceeding one year and/or be fined not exceeding five hundred dollars ($500), and shall in addition to this imprisonment and/or fine be ordered to make restitution to the person falsely accused of a crime for any damage which the person sustained as a result of the false complaint."

- 47 -

a factor which lends reliability to what, years earlier, might have been considered unreliable anonymous tips."). Thus, "a reasonable officer could conclude that a false tipster would think twice before using [any] such * * * system," which allows for identification. *Navarette*, 572 U.S. at 401; *see also Gates*, 462 U.S. at 233-34 ("[I]f an unquestionably honest citizen comes forward with a report of criminal activity—which if fabricated would subject him to criminal liability—we have found rigorous scrutiny of the basis of his knowledge unnecessary."); *United States v. Avilés-Vega*, 783 F.3d 69, 77 (1st Cir. 2015) ("A call made directly to the desk sergeant, rather than to a 911 operator, does not become unreliable solely because of that choice.").

For all these reasons, I would conclude that Artie's non-anonymous call "bore adequate indicia of reliability for the officer to credit the caller's account." *Navarette*, 572 U.S. at 398.

**2**

**Artie's Tip Constituted Reasonable Suspicion of Criminal Activity**

*Navarette* cautions that "[e]ven a reliable tip will justify an investigative stop only if it creates reasonable suspicion that 'criminal activity may be afoot.'" *Navarette*, 572 U.S. at 401 (quoting *Terry*, 392 U.S. at 30). In making this determination "[t]he standard takes into account 'the totality of the circumstances— the whole picture.'" *Id.* at 397 (quoting *Cortez*, 449 U.S. at 417). Critically, this

- 48 -

evidentiary burden is not high, "[t]he Fourth Amendment requires 'some minimal level of objective justification' for making the stop." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *INS v. Delgado*, 466 U.S. 210, 217 (1984)). "[T]he level of suspicion the standard requires is 'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less' than is necessary for probable cause." *Navarette*, 572 U.S. at 397 (quoting *Sokolow*, 490 U.S. at 7). On this record, the reasonable suspicion standard for this universally recognized minimal intrusion is easily satisfied.

In *Navarette*, the Supreme Court concluded that reasonable suspicion existed for officers to stop the truck driver because the alleged conduct, i.e., running the reporting party off the road, was "a significant indicator of drunk driving." *Navarette*, 572 U.S. at 403. Here, Artie's tip—that defendant was openly displaying a firearm—likewise demonstrated a "reasonable suspicion that 'criminal activity may be afoot.'" *Id.* at 401 (quoting *Terry*, 392 U.S. at 30); *see also Casas*, 900 A.2d at 1131 ("To be valid, an investigatory stop of a person or vehicle must be based on 'some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity.'") (quoting *Cortez*, 449 U.S. at 417).

Specifically, dispatch relayed to Officer Leach a report concerning a male reportedly walking with or waving a gun. Such conduct—possession of a firearm—is illegal in Rhode Island, unless lawfully licensed. *See* § 11-47-8(a) ("No person

- 49 -

shall, without a license or permit issued as provided in §§ 11-47-11, 11-47-12 and 11-47-18, carry a pistol or revolver in any vehicle or conveyance or on or about his or her person whether visible or concealed * * *.").

To be sure, Pires's open carry of a firearm in a high-crime neighborhood at 1 a.m. *could* have been lawfully permitted by a valid license, but critically, the United States Supreme Court instructs that "[a] determination that reasonable suspicion exists * * * need not rule out the possibility of innocent conduct." *United States v. Arvizu*, 534 U.S. 266, 277 (2002); *see also Navarette*, 572 U.S. at 403 ("[W]e cannot say that the officer acted unreasonably under these circumstances in stopping a driver whose alleged conduct was a significant indicator of drunk driving.").

Similarly, this Court recently concluded that despite the decriminalization of one ounce or less of marijuana, a law enforcement officer may rely upon a slight odor of marijuana, "with no other facts indicating quantity, to establish reasonable suspicion." *Li*, 297 A.3d at 923. Under the circumstances presented herein, a reasonable officer in Officer Leach's position possessed reasonable suspicion of ongoing criminal activity because possession of a firearm without a license is a crime subject to arrest, prosecution, and imprisonment. *See* § 11-47-8(a); *see also Avilés-Vega*, 783 F.3d at 72-73 (holding that a law enforcement officer possessed reasonable suspicion based upon unidentified caller reporting he observed a firearm in a vehicle).

- 50 -

Standing alone, the report that Pires was openly carrying a firearm—like the tip in *Navarette* that the truck driver had run the caller off the road—provided reasonable suspicion to conclude criminal activity may be occurring. Even absent the eyewitness and contemporaneous report of criminal conduct, this Court has recognized "[v]arious factors that contribute to a finding of reasonable suspicion of criminal activity include 'the location in which the conduct occurred, the time at which the incident occurred, the suspicious conduct or unusual appearance of the suspect, and the personal knowledge and experience of the police officer.'" *Keohane*, 814 A.2d at 330 (quoting *State v. Holdsworth*, 798 A.2d 917, 921 (R.I. 2002)). This Court also has noted that the reputation of a neighborhood may also be considered in assessing whether reasonable suspicion of criminal activity exists. *See Halstead*, 414 A.2d at 1147-48 ("We bear in mind that we must be realistic in considering whether the police were justified in their suspicion of defendant. A reasonable suspicion, like probable cause, is not an abstract principle to be considered in a vacuum; it involves a pragmatic analysis from the vantage point of a prudent, reasonable police officer in light of the facts known to him at the time of the detention.").

Considering the totality of circumstances, a reasonable officer with decades of law enforcement experience, such as Officer Leach, would also have been aware that, when dispatched to the intersection of Dunnell Avenue and Sisson Street for a

- 51 -

report of a man walking with or waving a firearm, this area was known to be "one of the higher crime areas in the City of Pawtucket." Officer Leach expounded that, based upon his experience with the PPD, he received or heard "more calls to that area than other areas[,]" and that those calls involved violent crimes involving weapons. *See Wright*, 74 F.4th at 732 ("There was a second factor supporting reasonable suspicion: The area was known for the precise type of criminal activity alleged in the tip.").

Additionally, an individual, like defendant, walking alone in a known high-crime neighborhood at approximately 1 a.m. would draw the attention of a reasonable police officer. As this Court previously noted, "[s]ome of the factors that may contribute to a reasonable suspicion of criminal activity include the location in which the conduct occurred, the time at which the incident occurred, the suspicious conduct or unusual appearance of the suspect, and the personal knowledge and experience of the police officer." *Abdullah*, 730 A.2d at 1077. Based upon the aggregate of these factors—and considering the dispatch that the suspect was in possession of a firearm—"[a] brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." *Halstead*, 414 A.2d at 1146 (quoting *Adams*, 407 U.S. at 146).

The majority largely sidesteps what it acknowledges is not a high evidentiary

bar, declaring that "some of the facts that the trial justice found particularly influential * * * bear little weight in a totality analysis because they occurred after defendant was seized." Later, in assessing the totality of circumstances analysis, the majority focuses upon Officer Leach's mindset, as well as the circumstances underlying the dispatch. This subjective inquiry is clear error. *Navarette* makes plain that the evidence must be "viewed from the standpoint of an *objectively reasonable police officer * * *.*" *Navarette*, 572 U.S. at 402 (emphasis added) (quoting *Ornelas*, 517 U.S. at 696); *see also Cortez*, 449 U.S. at 417 ("An investigatory stop must be justified by some *objective manifestation* that the person stopped is, or is about to be, engaged in criminal activity.") (emphasis added); *Li*, 297 A.3d at 917; *Casas*, 900 A.2d at 1131.

Against this weight of precedent, the majority's reliance on *United States v. Hensley*, 469 U.S. 221 (1985), is particularly curious. *Hensley* held that if a flyer or bulletin "has been issued in the absence of a reasonable suspicion, then a stop in the objective reliance upon it violates the Fourth Amendment." *Hensley*, 469 U.S. at 232. Reliance on *Hensley* is misplaced; subsequent United States Supreme Court precedent (*Navarette*) did not adopt this narrow focus on the subjective knowledge of the dispatcher, as does the majority.[7] The majority's reliance on *Hensley* in lieu

_____

[7] Whatever our disagreements may be, there can be no debate that Officer Leach was responding to an allegation of *ongoing criminal activity*. *United States v. Hensley*, 469 U.S. 221 (1985), however, concerned a police bulletin about a request to

of the Supreme Court's 2014 decision in *Navarette* is unexplained. *See State v. Leddy*, 555 A.2d 356, 359 (R.I. 1989) (distinguishing *Hensley* and observing "[o]bviously a police officer called upon to aid other law enforcement officials in the search for a criminal suspect is entitled to assume that those requesting such assistance have requisite information that will support an independent assessment of reasonable suspicion"); *see also* 4 Wayne R. LaFave, *Search and Seizure* § 9.5(j) (6th ed. 2020) (reviewing state and federal jurisprudence generally supporting the practice of officers relying on information conveyed through police channels).

---

investigate a *past or completed crime*. *Hensley*, 469 U.S. at 223. This distinction was recognized by the Supreme Court in *Navarette* and served as the basis for the Court's decision not to rely upon *Hensley* as part of its Fourth Amendment analysis. *See Navarette*, 572 U.S. at 402 n.2 ("Because we conclude that the 911 call created reasonable suspicion of an ongoing crime, we need not address under what circumstances a stop is justified by the need to investigate completed criminal activity. *Cf. United States v. Hensley*, 469 U.S. 221, 229, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985)."). Moreover, in *Hensley*, the Supreme Court acknowledged that "[t]he factors in the balance may be somewhat different when a stop to investigate past criminal activity is involved rather than a stop to investigate ongoing criminal conduct." *Hensley*, 469 U.S. at 228. For example, the Court observed that a seizure to investigate a completed crime "does not necessarily promote the interest of crime prevention as directly as a stop to investigate suspected ongoing criminal activity," "the exigent circumstances which require a police officer to step in before a crime is committed or completed are not necessarily as pressing long afterwards," "[p]ublic safety may be less threatened by a suspect in a past crime who now appears to be going about his lawful business than it is by a suspect who is currently in the process of violating the law," and "officers making a stop to investigate past crimes may have a wider range of opportunity to choose the time and circumstances of the stop." *Id.* at 228-29. Considering these distinctions, the majority's reliance on a case concerning the reasonable suspicion calculus for a *past crime*, such as *Hensley*—rather than a case concerning the reasonable suspicion calculus for an *ongoing crime*, such as *Navarette*—is misplaced.

- 54 -

In the circumstances of this case, I am hard-pressed to envision what, if any, other investigatory options were available to Officer Leach when he was dispatched at approximately 1 a.m. to a high-crime neighborhood for a report of a man with a gun. Neither the majority nor defense counsel has offered any. Nor are the deterrent purposes of the exclusionary rule served in this case. *See infra*. "Allegations of the threatening use of a weapon, made by [a] person claiming to be an eyewitness to the threats, required immediate police action * * *." *People v. Dolly*, 150 P.3d 693, 697 (Cal. 2007) (brackets omitted) (quoting *Ray v. Village of Woodridge*, 221 F. Supp. 2d 906, 914 (N.D. Ill. 2002)). The first seizure comported with the Fourth Amendment.

**B**

**Intervening Circumstances Separated the Two Seizures**

Although it remains my firm conviction that the first seizure was supported by reasonable suspicion, it is nonetheless unnecessary to resolve its lawfulness because the second seizure—which occurred *after* certain intervening circumstances—led to the discovery of the contraband. The majority entirely dismisses these intervening circumstances without explanation or analysis; specifically, dismissing the trial justice's determination that Pires was "deliberately noncompliant" with Officer Leach's instructions and declaring that it does not believe that Pires's actions in lowering his hands, "turning around and reaching

- 55 -

toward his waistband constituted an intervening event sufficient to attenuate the seizure's fruits from its illegality." This one and done approach does not comport with the constitutionally mandated totality of the circumstances *de novo* analysis.

It is, of course, fundamental that "a person is seized * * * for Fourth Amendment purposes if, in view of all the circumstances, a reasonable person would believe that he or she was not free to leave." *State v. Jimenez*, 33 A.3d 724, 732 (R.I. 2011) (brackets omitted) (quoting *State v. Vieira*, 913 A.2d 1015, 1020 (R.I. 2007)). However, Pires's calculated decision to lower his hands and reach into his waistband, where he had stashed a Smith & Wesson M&P .40-caliber firearm, flies in the face of the objective reasonable person analysis. A reasonable person viewing Pires's actions would conclude not only that Pires did not submit to authority, but also that, when he reached for the firearm, Pires was actively resisting detention. *See, e.g.*, *United States v. Mosley*, 743 F.3d 1317, 1325-26 (10th Cir. 2014) ("To comply with an order to stop—and thus to become seized—a suspect must do more than halt temporarily; he must submit to police authority, for there is no seizure without actual submission. * * * Submission under *Hodari D*. requires, at minimum, that a suspect manifest compliance with police orders.") (brackets and internal quotation marks omitted) (quoting *United States v. Salazar*, 609 F.3d 1059, 1066 (10th Cir. 2010)). The majority's conclusion that defendant was seized the moment he complied with Officer Leach's initial order to raise his hands—*and more*

- 56 -

*importantly remained seized notwithstanding the intervening circumstances and deliberate noncompliance*—overlooks these core Fourth Amendment principles and is simply erroneous.

In *Hodari D.*, the Supreme Court examined what constitutes an individual's "seizure" for purposes of the Fourth Amendment. *See Hodari D.*, 499 U.S. at 623. Late one evening two California police officers were on patrol in an unmarked vehicle in a high-crime neighborhood. *Id.* at 622. When the officers encountered four or five youths huddled around a parked vehicle, the minors fled on foot. *Id.* at 622-23. Officer Pertoso commenced a foot pursuit of Hodari and when "almost upon him," Hodari tossed away an object that appeared to be a small rock. *Id.* at 623. A "moment" after tossing away the object, Officer Pertoso tackled Hodari and placed him in custody. *Id.* The discarded object was later determined to be crack cocaine. *Id.*

The Supreme Court focused on whether Hodari had been "seized" for Fourth Amendment purposes at the point when he discarded the crack cocaine. *See Hodari D.*, 499 U.S. at 623. In so doing, the Court explained that, at common law, the word "seizure" was typically meant to "connote[] not merely grasping, or applying physical force to, the animate or inanimate object in question, but actually bringing it within physical control." *Id.* at 624. For example, "[a] ship still fleeing, even though under attack, would not be considered to have been seized as a war prize,"

- 57 -

*id.* (citing *The Josefa Segunda*, 10 Wheat. 312, 325-26 (1825)), and "[a] res capable of manual delivery was not seized until 'taken into custody,'" *id.* (brackets omitted) (quoting *Pelham v. Rose*, 9 Wall. 103, 106 (1870)). Following this historical perspective, the Court observed that "[t]o constitute an arrest, however—the quintessential 'seizure of the person' under our Fourth Amendment jurisprudence— the mere grasping or application of physical force with lawful authority, whether or not it succeeded in subduing the arrestee, was sufficient." *Id.*

Although the Supreme Court's teaching regarding an application of physical force to effectuate an arrest provides a perspective to the issues confronting this Court, neither *Hodari D.* nor this case concerned the use of force at the critical moment. Rather, Hodari argued that a seizure occurs "when the officer, by means of physical force *or show of authority*, has in some way restrained the liberty of a citizen." *Hodari D.*, 499 U.S. at 625 (quoting *Terry*, 392 U.S. at 19 n.16). Because Officer Pertoso engaged in a foot pursuit, Hodari claimed that this "show of authority" constituted a "seizure" for Fourth Amendment purposes and that he was seized prior to discarding the crack cocaine. *Id.* at 625-26. Critically for our analysis, the Supreme Court rejected Hodari's argument and instead held that "[a]n arrest requires *either* physical force * * * *or*, where that is absent, *submission* to the assertion of authority." *Id.* at 626. Force or submission is required for a seizure. Again, critically for this case, the Supreme Court concluded that "since Hodari did

not comply with [Officer Pertoso's command to halt,] he was not seized until he was tackled." *Id.* at 629. In other words, because Hodari did not submit to the assertion of authority, the seizure occurred only through the subsequent use of physical force.

In *United States v. Johnson*, 212 F.3d 1313 (D.C. Cir. 2000), two Metropolitan Police Department officers discovered a parked car with two occupants. *See Johnson*, 212 F.3d at 1314. After witnessing another person lean into the vehicle and hand the passenger an object, officers investigated. *Id.* at 1314-15. As Officer Fulton approached the vehicle, he observed the passenger making a "shoving down" motion, leading Officer Fulton to believe the passenger might be armed. *Id.* at 1315. Officer Fulton drew his firearm and directed the passenger to show his hands. *Id.* Rather than comply, the passenger made additional "shoving motions down," which led Officer Fulton to reach into the vehicle and touch a bulge on the passenger's clothing. *Id.* The bulge was discovered to be crack cocaine. *Id.*

The passenger moved to suppress the evidence, arguing that Officer Fulton lacked reasonable suspicion to conduct the stop and frisk. *See Johnson*, 212 F.3d at 1315. The United States Court of Appeals for the District of Columbia Circuit disagreed and concluded that "we do not think the seizure took place immediately after [the passenger's] first 'shoving down' motion, when [Officer] Fulton drew his gun and ordered [the passenger] to raise his hands." *Id.* at 1316. Instead, the court explained that:

- 59 -

"Under *California v. Hodari D.,* 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), a seizure requires the application of physical force or submission to an assertion of authority. *Before* [*the passenger*] *raised his hands,* [*Officer*] *Fulton had made a show of authority but* [*the passenger*] *had not submitted to it. On the contrary, he continued to make 'shoving down' motions, gestures that were the very opposite of complying with* [*Officer*] *Fulton's order, and which a reasonable officer could have thought were actually suggestive of hiding (or retrieving) a gun.* In sum, by the time the stop actually took place, it was supported by [the passenger's] continued furtive gestures in response to being confronted by a police officer, and that was suspicious enough to support a reasonable belief that [the passenger] may have been engaged in criminal activity." *Id.* at 1316-17 (emphasis added).

Likewise, in *United States v. King*, 724 F.2d 253 (1st Cir. 1984), the United States Court of Appeals for the First Circuit considered a vehicular stop, which the court assumed was unlawful. *See King*, 724 F.2d at 256. During the unlawful stop, Trooper Landry asked the passenger to exit the vehicle; and, after the passenger had done so, Trooper Landry touched the passenger's jacket and felt what he believed was a bulletproof vest. *Id.* at 255. Moments later, the driver began firing a gun in the direction of Trooper Landry. *Id.* During the gunfire, Trooper Landry grabbed the passenger and pulled a 9 mm semiautomatic pistol from the man's belt. *Id.*

On appeal, the passenger argued that, since Trooper Landry "was in the process of illegally searching him when the shot was fired, the search was poisoned by the previous illegality, *i.e.*, that, but for the previous illegality, the shooting would

- 60 -

never have taken place." *King*, 724 F.2d at 256. Despite the presumption that the initial seizure was unlawful, the Court of Appeals rejected the argument that the seizure of the firearm was tainted. *Id.* The court explained:

> "The [Supreme] Court's decisions clearly indicate that the poisonous tree doctrine does not extend as far as a 'but for' causation test might take it. If the means of acquiring evidence are substantially removed and distinguishable from the initial illegality, neither the 'deterrence' rationale nor the 'judicial integrity' rationale requires application of the exclusionary rule." *Id.* (quoting J. Israel and W. LaFave, *Criminal Procedure, Constitutional Limitations* 290 (3d ed. 1980)).

As such, the court recognized that "[a]t the moment the shot was fired, [Trooper] Landry had all the probable cause that was needed to search [the passenger]" and that "the shooting was an independent intervening act which purged the taint of the prior illegality." *King*, 724 F.2d at 256. Accordingly, the court determined that the firearm was properly seized. *Id.*; *see also State v. Jennings*, 461 A.2d 361, 368 (R.I. 1983) ("The focus of the Fourth Amendment inquiry, therefore, must be 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'") (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)).

So too here. Even assuming Pires's initial submission to Officer Leach's authority (stopping and raising his hands) amounted to an unlawful seizure, as the

majority concludes, Pires's intervening "noncompliant" conduct was "the very opposite of complying" with Officer Leach's authority and established that Pires was no longer in submission. *See Johnson*, 212 F.3d at 1316. Indeed, Pires's potentially life-threatening actions were so overtly hostile to Officer Leach's authority that during the suppression hearing, defense counsel argued that the state's version of events was implausible and characterized defendant's actions as akin to "police-assisted suicide."

The trial justice rejected defense counsel's implausibility argument and found that Pires was "deliberately noncompliant" when he disregarded Officer Leach's instruction to walk backward. Even more so, the trial justice appropriately focused on the precise moment Pires unquestionably no longer submitted to Officer Leach's authority: when Pires turned his back on Officer Leach from a distance of twelve to fifteen feet, lowered his hands, and reached into his waistband where the firearm was stashed. Confronted with these acts of life-threatening defiance, Officer Leach recounted that "when [Pires] spun around and reached towards his waistband, it was a matter of a split-second decision: Do I confront him with my firearm and let him turn around, or do I try to close the distance to the threat? And that's what I chose to do."

Similar to other courts that have confronted noncompliant acts, I would conclude that, when Pires acted in defiance of legal authority and/or made gestures

consistent with reaching for a weapon, he was no longer seized for Fourth Amendment purposes. *See, e.g.*, *United States v. Waterman*, 569 F.3d 144, 146 (3d Cir. 2009) (concluding defendant failed to submit to authority when he "moved his hands toward his waistband, and ultimately retreated into the house"); *King*, 724 F.2d at 256 ("We believe that the shooting was an independent intervening act which purged the taint of the prior illegality."); *Plummer v. United States*, 983 A.2d 323, 334 (D.C. 2009) ("[T]he police did not apply force to Mr. Plummer before he made the movements to his waist * * *."); *see also United States v. Camacho*, 661 F.3d 718, 730 (1st Cir. 2011) ("Some courts have held that a defendant's resistance to even an invalid *Terry* stop or arrest can be independent grounds for a new, independent arrest, and that evidence discovered in a search incident to that lawful arrest is admissible.").[8]

The majority faults the trial justice for considering the intervening circumstances and concludes that reliance on these events was inapposite "because they occurred after defendant was seized." The majority also suggests that the trial justice failed to articulate the precise moment Pires was seized. I disagree. Like the

---

[8] *California v. Hodari D.*, 499 U.S. 621 (1991), provides a useful hypothetical to support the conclusion that a suspect initially seized may, through defiance, no longer be seized for Fourth Amendment purposes: "If, for example, [Officer] Pertoso had laid his hands upon Hodari to arrest him, but Hodari had broken away and had *then* cast away the cocaine, it would hardly be realistic to say that that disclosure had been made during the course of an arrest." *Hodari D.*, 499 U.S. at 625.

hypothetical in *Hodari D.*, *King*, and other cases where a suspect is momentarily seized, but thereafter acts in contravention of lawful authority, Pires's life-threatening defiance with Officer Leach's commands demonstrated that defendant was no longer surrendering to lawful authority, and, therefore, the first seizure had terminated. *See Thompson v. Whitman*, 85 U.S. 457, 471 (1873) ("A seizure is a single act, and not a continuous fact.  Possession, which follows seizure, is continuous.").  Moments later, Officer Leach applied the full-nelson hold, and at that point, seized Pires for the second time. *See id.*  The trial justice properly appreciated these events when he concluded that reasonable suspicion was present based upon the intervening circumstances and that defendant was seized when Officer Leach "physically wrapped the defendant up and waited for back-up * * *."

The majority excuses Pires's failure to turn around and walk backward and suggests that such noncompliance "did not vitiate his overall submission to Officer Leach's show of authority."  The majority focuses on one portion of Officer Leach's cross-examination testimony, which suggests that at the moment defendant was walking toward Officer Leach, he perceived defendant to be submitting to his authority.  If this action constituted the sole noncompliant conduct, I would agree; but the record is otherwise ominously clear.

For our purposes, it is undisputed that when defendant came within twelve to fifteen feet of Officer Leach, Pires spun around, lowered his hands, and reached into

his waistband. It should also not be lost upon anyone that, despite ignoring Officer Leach's persistent commands to turn around, it was at this precise moment—when he lowered his hands and reached into his waistband—that Pires decided to turn around. The record, taken as a whole, reflects that the parties and the trial justice appreciated this distinct line of demarcation separating defendant's surrender to authority from defendant's defiance of authority.

For example, moments before the "[s]ubmissive to [his] authority" testimony, defense counsel was questioning Officer Leach concerning the events upon his arrival at the intersection:

> "[DEFENSE COUNSEL]: [Pires] didn't run?
>
> "[OFFICER LEACH]: No.
>
> "[DEFENSE COUNSEL]: He didn't make any furtive gestures?
>
> "[OFFICER LEACH]: *Other than turning around and putting his hands in his waistband.*
>
> "[DEFENSE COUNSEL]: *I'm talking about, Officer, when you first got there*, parked your vehicle on Dunnell [S]treet, had your lights on the subject, lighted streets, you just told us he saw you. He did not run, did he?
>
> "[OFFICER LEACH]: No." (Emphases added.)

Later, after the "submissive" testimony, defense counsel continued questioning Officer Leach and focused on the moment when he rushed defendant and applied the full-nelson hold:

- 65 -

"[DEFENSE COUNSEL]: So this was a quick approach from behind, right?

"[OFFICER LEACH]: Yes.

"[DEFENSE COUNSEL]: And he again did not run or try to flee or be evasive in any way, right?

"[OFFICER LEACH]: He reached towards his waistband, sir.

"* * *

"[DEFENSE COUNSEL]: And he did what you told him to do as soon as you saw him?

"THE COURT: Well, that's not true. And that misstates and mischaracterizes his testimony. He did not do what he was supposed to do.

"[DEFENSE COUNSEL]: *I said as soon as he saw him, Your Honor*." (Emphasis added.)

The parties and the trial justice universally recognized that Pires's conduct shifted from surrender to defiance. The majority's reference to Officer Leach's "submissive to [his] authority" testimony should be read in context with his entire testimony evidencing defendant's defiance, as well as the Fourth Amendment implications of such resistance.

The majority concludes otherwise, specifically that the simultaneous occurrence of these three events—Pires lowering his hands, turning his back on Officer Leach, and reaching into his waistband where he had a gun—is insufficient to constitute an intervening event. I am hard-pressed to discern what additional

- 66 -

actions in these circumstances are required in order to constitute an intervening event necessitating protective measures. *See, e.g.*, *United States v. Bruce*, 977 F.3d 1112, 1120 (11th Cir. 2020) ("[T]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect.") (quoting *Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007)).

Considering the totality of circumstances, it is my opinion that the trial justice properly assessed whether reasonable suspicion existed at the time of the second seizure. At that moment, the record establishes, Officer Leach was confronted with an unknown male reported to be in possession of a gun, walking alone in a high-crime neighborhood, who, in the early morning hours, was in "deliberate[] noncomplian[ce]" with Officer Leach's instructions to walk backward. The trial justice also was correct, in his totality of the circumstances analysis, to consider Pires's decision to turn away from Officer Leach at the same moment he lowered his hands and reached into his waistband. The majority acknowledges that these were "all permissible factors for the trial justice to consider," but erroneously rejects the consideration of some factors because, the majority concludes, they occurred *after* Pires was seized. As discussed *supra*, the majority overlooks the intervening events that terminated the first seizure and preceded the second seizure, and deviated from the totality of the circumstances prism.

Applying a *de novo* standard of review to the evidence in this case, I conclude

that the confluence of these events establishes that a reasonable law enforcement officer in Officer Leach's position with his experience possessed, at a minimum, reasonable suspicion (and likely probable cause) to detain Pires and conduct a search for weapons. The subsequent *Terry* search revealed the firearm at issue and a search incident to arrest discovered the controlled substances.

## C

## The Attenuation Doctrine

"The exclusionary rule bars from introduction at trial evidence obtained either during or as a direct result of searches and seizures in violation of an individual's Fourth Amendment rights." *Jennings*, 461 A.2d at 368. This prohibition extends to indirect products of unlawful actions. *Id.* As this Court has recognized, however, "[n]ot all statements [or evidence] derived from an illegal arrest or search must be excluded in every case." *Id.*; *see also Strieff*, 579 U.S. at 235 ("[E]ven when there is a Fourth Amendment violation, this exclusionary rule does not apply when the costs of exclusion outweigh its deterrent benefits."). The exclusionary rule is, after all, a judicially created prophylactic measure. *See State v. McGuire*, 273 A.3d 146, 161-62 (R.I. 2022) ("The Supreme Court * * * recognized that 'the Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands,' and the exclusionary rule 'thus operates as a judicially created remedy.'") (brackets omitted) (quoting *United States v. Leon*, 468 U.S. 897, 906

(1984)).

At least three exclusionary rule exceptions have been recognized: the independent source doctrine, the inevitable discovery doctrine, and, relevant here, the attenuation doctrine. *See, e.g.*, *Strieff*, 579 U.S. at 238. Pursuant to the "attenuation doctrine: Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" *Id.* (quoting *Hudson v. Michigan*, 547 U.S. 586, 593 (2006)). Stated differently, the "attenuation doctrine evaluates the causal link between the government's unlawful act and the discovery of evidence, which often has nothing to do with a defendant's actions." *Id.*

In determining the applicability of the "attenuation doctrine," the United States Supreme Court established a three-prong test:

> "First, we look to the 'temporal proximity' between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search. * * * Second, we consider 'the presence of intervening circumstances.' * * * Third, and 'particularly' significant, we examine 'the purpose and flagrancy of the official misconduct.'" *Strieff*, 579 U.S. at 239 (quoting *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975)).

This Court has applied the Supreme Court's three-prong test on numerous occasions.

*See, e.g.*, *Jennings*, 461 A.2d at 368 ("Such statements may be admissible if the state can establish that the connection between the unlawful action and the subsequent statement has 'become so attenuated as to dissipate the taint.'") (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)); *see also Casas*, 900 A.2d at 1134 ("Because consent can be valid notwithstanding an illegal detention, we shall examine whether that consent was sufficiently attenuated with respect to the illegal arrest as to be admissible."); *State v. Burns*, 431 A.2d 1199, 1205 (R.I. 1981). Without even mentioning the three-prong test, the majority concludes that it is satisfied that Pires's actions in lowering his hands, spinning around, and reaching into his waistband for a gun are insufficient to attenuate the first seizure (which the majority concludes was unlawful) from the second lawful seizure, *after* which the gun and controlled substances were discovered. I submit that adherence to the attenuation doctrine produces a different result.

The first factor, temporal proximity, weighs in favor of Pires. Approximately thirty seconds separated the first (unlawful) seizure from the second seizure during which the evidence subject to the motion to suppress was discovered. This Court's precedent demonstrates that we have affirmed the suppression of evidence where more time has elapsed between the two events. *See, e.g.*, *State v. Robinson*, 658 A.2d 518, 521 (R.I. 1995) ("[T]he confinement that followed the illegal arrest was still ongoing at the time defendant gave a statement more than twenty-four hours later.");

*Burns*, 431 A.2d at 1206 ("[D]efendant made his statements some six to eight hours after he was taken into custody. Moreover, from the record, we see no intervening event of significance sufficient to break the connection between the illegal arrest and the statements made.") (footnote omitted). While consideration of the temporal proximity favors defendant, caselaw demonstrates that this factor is the least persuasive prong.

The second factor, the presence of intervening circumstances, favors the state. As discussed *supra*, in *King*, the Court of Appeals assumed that a motor-vehicle stop was unlawful. *See King*, 724 F.2d at 256. Nonetheless, the court concluded that at the moment the driver began shooting, the unlawful seizure terminated and "[Trooper] Landry had all the probable cause that was needed to search [the passenger]." *Id.* The court explained, "the shooting was an independent intervening act which purged the taint of the prior illegality."[9] *Id.*

---

[9] Other courts have likewise concluded that resistance or flight during an unlawful seizure represents an intervening act that provides reasonable suspicion or probable cause for a search. *See United States v. Sprinkle*, 106 F.3d 613, 619 (4th Cir. 1997) ("Officer Riccio had probable cause to arrest Sprinkle because the new crime purged the taint of the prior illegal stop."); *United States v. Dawdy*, 46 F.3d 1427, 1430-31 (8th Cir. 1995) ("[S]everal courts consider resistance to even an illegal arrest to be grounds for a second, legitimate arrest."); *United States v. Nooks*, 446 F.2d 1283, 1288 (5th Cir. 1971) ("Before the trunk of the automobile was opened it had become academic whether Brown's original arrest was lawful or not. Brown's description and his precipitate flight had furnished additional evidence to show probable cause for his arrest and for the search of the automobile.").

The First Circuit Court of Appeals subsequently distinguished *King*. In *Camacho*, officers unlawfully detained defendant Camacho, during which Officer Sousa touched Camacho's waist and immediately felt the butt of a gun. *See Camacho*, 661 F.3d at 722, 726. Camacho responded by shoving Officer Sousa and after a brief struggle, Camacho was subdued and taken into custody. *Id.* at 722. A search incident to arrest revealed a loaded .40-caliber Glock revolver hidden beneath Camacho's belt. *Id.*

In contrast to *King*, the First Circuit Court of Appeals concluded that "the discovery of the gun was so tainted by the illegal stop that it should have been suppressed as 'fruit of the poisonous tree.'" *Camacho*, 661 F.3d at 728. The court explained that while Camacho's actions of shoving Officer Sousa and resisting arrest provided independent grounds for arrest and a search incident to arrest, the gun at issue was discovered *prior* to the actions resulting in probable cause. *See id.* at 730 ("[T]he district court failed to account for the fact that Officer Sousa conducted the frisk—the search that first discovered the gun—*before* Camacho shoved him and *before* Camacho was arrested.").

The case before this Court more closely resembles *King*, where an unprovoked intervening act turned what is presumed to be an unlawful initial seizure into a subsequent lawful arrest supported by probable cause. Whereas the *King* court concluded that "the shooting was an independent intervening act which purged the

- 72 -

taint of the prior illegality," *King*, 724 F.2d at 256, here, the majority dismisses Pires's intervening actions and ignores the attenuation doctrine, which effectively clothes Pires and similarly situated suspects with immunity for acts giving rise to probable cause to arrest after an initial unlawful seizure. Pires's "deliberately noncompliant" and alarming conduct, combined with his intentional decision to turn his back on Officer Leach, lower his hands, and reach into his waistband represents independent intervening actions that sufficiently purge any taint from the first seizure.

The third factor, "the purpose and flagrancy of the official misconduct," also heavily favors the state. The Supreme Court has described this consideration as "particularly significant." *Strieff*, 579 U.S. at 239 (internal quotation marks omitted) (quoting *Brown*, 422 U.S. at 604).

The exclusionary rule is not a constitutional command, but instead represents a "prudential doctrine." *Davis v. United States*, 564 U.S. 229, 236 (2011) (internal quotation marks omitted). It is a common law prophylactic measure. *See McGuire*, 273 A.3d at 162; *see also State v. Huy*, 960 A.2d 550, 556 (R.I. 2008) (recognizing the "prophylactic purposes that underlie the exclusionary rule—to deter law enforcement officers from violating a defendant's rights") (brackets omitted) (quoting *State v. Barkmeyer*, 949 A.2d 984, 998 (R.I. 2008)). The Supreme Court has recognized that the exclusionary rule is designed not to "'redress the injury'

- 73 -

occasioned by an unconstitutional search," but rather "[t]he rule's sole purpose * * * is to deter future Fourth Amendment violations." *Davis*, 564 U.S. at 236-37 (quoting *Stone v. Powell*, 428 U.S. 465, 486 (1976)). "Where suppression fails to yield 'appreciable deterrence,' exclusion is 'clearly * * * unwarranted.'" *Id.* at 237 (quoting *United States v. Janis*, 428 U.S. 433, 454 (1976)); *see also Strieff*, 579 U.S. at 241 ("The exclusionary rule exists to deter police misconduct."). "The analysis must also account for the 'substantial social costs' generated by the rule." *Davis*, 564 U.S. at 237 (quoting *Leon*, 468 U.S. at 907). The Supreme Court has referred to exclusion "as a 'last resort.'" *Id.* (quoting *Hudson*, 547 U.S. at 591).

In *Leon*, the Supreme Court recalibrated the cost-benefit analysis for exclusion to focus on the "'flagrancy of the police misconduct' at issue." *Davis*, 564 U.S. at 238 (quoting *Leon*, 468 U.S. at 911). As the Court later recounted, "[t]he basic insight of the *Leon* line of cases is that the deterrence benefits of exclusion 'vary with the culpability of the law enforcement conduct' at issue." *Id.* (brackets omitted) (quoting *Herring v. United States*, 555 U.S. 135, 143 (2009)). "When the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." *Id.* (quoting *Herring*, 555 U.S. at 144). "But when the police act with an objectively reasonable good-faith belief that their conduct is lawful * * * or when their conduct involves only simple, isolated negligence * * * the deterrence

- 74 -

rationale loses much of its force and exclusion cannot pay its way[.]" *Id.* (internal quotation marks omitted).

Here, there is not a scintilla of evidence that Officer Leach's conduct in executing the first seizure represented deliberate, reckless, or grossly negligent conduct in disregard of the Fourth Amendment. *See Davis*, 564 U.S. at 238. The majority agrees and observes that "Officer Leach initiated the stop and seized defendant in objective reliance on the information conveyed to him by the dispatcher." Later, the Court reiterates that "[t]his testimony makes clear that Officer Leach stopped defendant in 'objective reliance' on the dispatch." On this critical question, the Court is unanimous in its conclusion that Officer Leach acted in an objective good-faith reliance on the dispatch. Under such circumstances, "the 'deterrence rationale loses much of its force' and exclusion cannot 'pay its way[.]'" *Id.* (quoting *Leon*, 468 U.S. at 919, 908 n.6). The majority provides no explanation to support its contrary conclusion.

As such, the three-prong attenuation test favors the state. Assuming that the first seizure was unlawful, I would conclude that the second seizure and the discovery of the evidence *after* the second seizure was sufficiently attenuated and that the purpose of exclusion is not advanced in this case.

While I do not join the majority's opinion, I suggest that, in light of the majority's concerns about the evidentiary failure on the part of the state, the proper

remedy would be a remand for additional evidence to be submitted at a suppression hearing.[10] *See State v. Taveras*, 39 A.3d 638, 645 (R.I. 2012) (noting that this Court granted the motion to hold the appeal in abeyance and remanded for further findings regarding scope of the search); *United States v. Cutchin*, 956 F.2d 1216, 1218 (D.C. Cir. 1992) ("[W]e are compelled to remand for a new suppression hearing, so that the parties can present evidence, including the tape, pertaining to the dispatcher's justification for the radio broadcast.").

Finally, in the face of the majority's holding, the dissent poses a single question about future stops: What do we tell the police?

## IV

## Conclusion

For the reasons set forth herein, I would hold that the trial justice did not err in denying the motion to suppress. Accordingly, I respectfully dissent.

---

[10] This suggestion is especially appropriate because the focus of the suppression hearing by the defense was the law surrounding an anonymous tip, which simply was not the proper focus.



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE
Licht Judicial Complex
250 Benefit Street
Providence, RI 02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Napoleao Pires. |
| **Case Number** | No. 2021-34-C.A. (P2/18-488AG) |
| **Date Opinion Filed** | June 26, 2024 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Robert D. Krause |
| **Attorney(s) on Appeal** | For State:<br><br>Virginia M. McGinn<br>Department of Attorney General |
| | For Defendant:<br><br>Robert J. Caron, Esq. |